David R. Giles
Attorney at Law
34 Rynda Road
South Orange, New Jersey 07079
973-763-1500
davidgiles@davidgileslaw.com

Attorney for the Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| J.S. and S.S., on behalf of A.S., | Civil Action No.: |
| Plaintiffs, | |
| v. | |
| WEST MORRIS REGIONAL HIGH SCHOOL DISTRICT BOARD OF EDUCATION. | **BRIEF IN SUPPORT OF ORDER TO SHOW CAUSE AND STAY PUT ORDER** |
| Defendant. | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................i

PRELIMINARY STATEMENT.............................................1

PROCEDURAL HISTORY...............................................2

STATEMENT OF FACTS..............................................3

JURISDICTION OVER THIS INTERLOCUTORY STAY-PUT APPEAL..........16

STANDARD OF REVIEW IN IDEA STAY-PUT CASES.....................17

ARGUMENT.......................................................17

I.    THE ALJ'S ORDER DENYING STAY-PUT RELIEF SHOULD BE
      REVERSED BECAUSE HE ERRONEOUSLY INTERPRETED THE TERM "CURB
      TO CURB TRANSPORTATION" AS PERMITTING THE DISTRICT TO PICK
      UP AND DROP OFF A.S. A THIRD OF A MILE AWAY FROM HER HOME
      ALONG A DANGEROUS MOUNTAIN ROAD...........................17

CONCLUSION.....................................................34

# TABLE OF AUTHORITIES

Page(s)

Cases

*Anchorage Sch. Dist. v. N.S. ex rel. R.P.*,
  2007 WL 8058163 (D. Alaska Nov. 8, 2007) ................ Passim
*C.H. v. Cape Henlopen Sch. Dist.*,
  606 F.3d 59 (3d Cir. 2010) .................................. 22
*Cinnaminson Twp. Bd. of Educ. v. K.L.*,
  2016 WL 4212121 (D.N.J. Aug. 9, 2016) ................... 16, 17
*D.S. v. Bayonne Bd. of Educ.*,
  602 F.3d 553 (3d Cir. 2010) ................................. 17
*DeLeon v. Susquehanna Cmty. Sch. Dist.*,
  747 F.2d 149 (3d Cir. 1984) ................................. 31
*Drinker v. Colonial Sch. Dist.*,
  78 F.3d 859 (3d Cir. 1996) ........................ 21, 22, 23
*Endrew F. v. Douglas Cty. Sch. Dist. RE-*,
  137 S. Ct. 988 (2017) .................................. 18, 19
*Forest Grove Sch. Dist. v. T.A.*,
  557 U.S. 230 (2009) ........................................ 18
*Honig v. Doe*,
  484 U.S. 305 (1988) .................................... Passim
*In re Educ. Assignment of Joseph R.*,
  318 Fed. Appx. 113 (3d Cir. 2009) .......................... 17
*J.D. v. Glouceser County Vocation Bd. of Educ.*,
  2019 WL 2998770 (OAL, May 13, 2019) ....................... 21
*L.E. v. Ramsey Bd. of Educ.*,
  435 F.3d 384 (3d Cir. 2006) ................................. 17
*M.G. v. New York City Dep't of Educ.*,
  982 F. Supp. 2d 240 (S.D.N.Y. 2013) .................... 22, 23
*M.R. v. Ridley Sch. Dist.*,
  744 F.3d 112 (3d Cir. 2014) ............................ 21, 22
*Michael C. v. Radnor Twp. Sch. Dist.*,
  202 F.3d 642 (3d Cir. 2000) ................................. 22
*Pardini v. Allegheny Intermediate Unit*,
  420 F.3d 181 ................................................ 17
*R.S. v. Somerville Board of Education*,
  2011 WL 32521 (D.N.J. Jan. 5, 2011) ........................ 17
*Rowley*,
  458 U.S. ................................................... 19
*Sell v. New Jersey Transit Corp.*,
  298 N.J. Super. 640 (App. Div. 1997) ....................... 27

Statutes

20 U.S.C. § 1401(9)..................................... 18, 28

```
20 U.S.C. § 1401(26)......................................... 19
20 U.S.C. § 1414............................................. 19
20 U.S.C. § 1414(d).......................................... 18
20 U.S.C. § 1414(d)(1)(B).................................... 18
20 U.S.C. § 1415............................................. 20
20 U.S.C. § 1415(j).......................................... 20
```

## Regulations

```
34 C.F.R. § 37.129........................................... 27
34 C.F.R. § 37.3............................................. 27
34 C.F.R. § 300.116(b)(2).................................... 22
I 13, 14, 15, 16
N.J.A.C. 6A:14-2.7(u).................................... 20, 21
N.J.A.C. 6A:14-3.9(a)(7)..................................... 19
N.J.A.C. 6A:27-1.3.................................. 13, 14, 15, 16
N.J.A.C. 6A:27-5.1(a)(2)................................. 19, 29
```

## Other Authorities

*Letter to Smith,* 211 IDELR 191............................... 19

## PRELIMINARY STATEMENT

By this application for an order to show cause, Plaintiffs J.S. and S.S., on behalf of A.S., seek an order reversing an Administrative Law Judge's order denying A.S. stay-put relief and directing the Board to comply immediately with A.S.'s stay-put IEP and implement the curb to curb transportation included therein by picking her up and dropping her off in front of her home when transporting her to and from school during the pendency of the special education due process hearing regarding the parties' underlying transportation dispute presently before the New Jersey Office of Administrative Law.

The Administrative Law Judge concluded that the District's decision to stop picking her up and dropping her off in front of her home, as she had been for the previous nine years, and instead have her picked up and dropped off a third of a mile away from her home along a mountain road that is dangerous for pedestrians did not violate A.S.'s right to stay-put essentially because, without hearing any live testimony, he found that school officials were well-intended and the decision was made to promote safety, the term "curb to curb transportation" encompassed the distant pick-up and drop-off location, any perceived deviation from curb to curb transportation amounts to no more than a minor change that does not significantly effect

A.S.'s learning, and school officials are doing the best they can to implement the curb to curb transportation.

However, in considering a motion to enforce stay-put, the role of the court is only to determine what is the stay-put placement and order school officials to comply with it pending a final resolution of the parties' dispute. It was improper for the ALJ to deny A.S. stay-put based on his assessment of the District's intentions or the appropriateness of the IEP, and, as a matter of law, based on the undisputed facts, the Board's decision to have A.S. picked up and dropped off away from her home imposed a change to her IEP that "is likely to affect in some significant way [her] learning experience" and thus violated her right to stay-put.

For these reasons and as explained further below, the Administrative Law Judge's order denying A.S. stay-put should be reversed, and the Board should be ordered to comply with A.S.'s stay-put IEP by having her picked up and dropped off in front of her home until a final resolution of the parties' dispute over her transportation.

## PROCEDURAL HISTORY

On October 5, 2021, Plaintiffs requested a due process hearing to challenge the Board's discontinuation of A.S.'s IEP transportation service and its refusal to implement the curb to

curb transportation in her IEP. A10.[1] On October 25, 2021,
attempted to settle their dispute through mediation but were
unsuccessful and the Department of Education transmitted the
case to the Office of Administrative Law ("OAL") for a hearing.
The parties engaged in further settlement discussions
facilitated by an Administrative Law Judge ("ALJ") from November
9 through early December 2022 but were unable to resolve their
differences.

On January 5, 2022, Plaintiffs filed a motion for emergent
relief to enforce stay-put. On January 25, 2022, oral argument
on the motion was held without live testimony before the
Honorable Jude-Anthony Tiscornia, ALJ. On January 26, 2022,
Judge Tiscornia issued a Final Decision – Emergent Relief
denying A.S.'s motion.

## STATEMENT OF FACTS

Plaintiffs J.S. and S.S. are the parents of A.S. Verified
Compl., ⁋ 3. A.S. is a fourteen-year-old child with a disability
eligible for special education and related services under the

---

[1] The ALJ's decision, A.S.'s request for a due process hearing, and the
evidence introduced at the stay-put hearing (i.e., J.S.'s certifications and
exhibits attached thereto and a school administrator's affidavit) are
included in an Appendix submitted herewith entitled, Appendix of the OAL Stay
Put Hearing Records. In deciding A.S.'s motion to enforce stay, the ALJ
considered the certifications, affidavit and exhibits included in the
Appendix, as well as the briefs and oral argument, but no live testimony was
taken. The transcript of the hearing was ordered but has not yet been
produced. References to records in the Appendix will refer to the page number
of the record preceded by the letter, "A," so, for example, a reference to
the record beginning at page 1 would be cited as "A1."

category, Other Health Impaired. *Id.,* ¶ 7; A30. She has been diagnosed with a Major Depressive Disorder, Attention Deficit Hyperactivity Disorder, Dysgraphia, Nonverbal Learning Disorder, and Unspecified Neurodevelopmental Disorder. *Id.*; A33.

A.S. lives with her parents and brother in Long Valley, New Jersey, on Schooley's Mountain Road, where the family has resided since 2006. *Id.,* ¶ 8. As residents of Long Valley, A.S. and her brother have fallen within the jurisdiction of the Washington Township School District ("WTSD") for elementary school (kindergarten through eighth grade) and the West Morris Regional High School District ("WMRHSD" or "the District") for high school. *Id.* A.S. is currently a high school freshman, and her brother graduated from high school in June 2020. *Id.*

A.S. was originally classified on December 15, 2014. *Id.,* ¶ 9. At that time, she attended Benedict A. Cucinella Elementary School. *Id.* She attended Cucinella until June 2018 after which she was promoted to Long Valley Middle School. *Id.* She attended Long Valley Middle School until the end of seventh grade in June 2020. *Id.*

From the time she was first classified in 2014 through June of 2020, her IEP called for A.S. to receive in-class support, counseling and a 1:1 aide (in middle school, she also received pull-out resource program services in math). *Id.,* ¶ 10. Her IEP did not, however, include transportation because A.S., like her

4

brother, and all other public elementary school students who live on Schooley's Mountain Road, already received transportation from WTSD. *Id.*

For thirteen years, from September 2007, when her brother started kindergarten, through June 2020, when A.S. last attended Long Valley Middle School, A.S. and her brother were picked up and dropped off every day in front of their home by a full-sized yellow bus that also picked up other WTSD students along Schooley's Mountain Road. *Id., ⁋* 11. Even today, WTSD continues to pick up A.S.'s non-classified ten-year-old next-door neighbor at her driveway using a full-sized yellow bus. *Id.*

In June 2020, at the end of her seventh grade, A.S. was placed by WTSD for eighth grade in an out-of-district placement, the Newmark School in Scotch Plains, New Jersey. *Id., ⁋* 12; A87. Transportation was added as a related services to her IEP. *Id.*; A112. The IEP team concluded that she required "curb to curb" transportation. *Id.* Accordingly, beginning in September 2020, A.S. was transported to and from Newmark by WTSD, and she continued to be picked up and dropped off in front of her home, but WTSD used a private vendor, K & S Transportation, which used a van, to drive A.S. to and from school. *Id.,* ⁋13.

On January 14, 2021, A.S.'s out-of-district placement was changed to Barnstable Academy in Oakland, New Jersey. *Id.,* ⁋ 14; A120. As her transportation needs remained the same, she

continued to receive "curb to curb" transportation pursuant to her IEP. *Id.*; A144. However, because of the change in her bus route, WTSD changed vendors and A.S. was transported to and from Barnstable by Prestige Bus Service which continued to pick her up and drop her off in front of her home using a van. *Id.*

On April 23, 2021, WTSD convened a "Transition IEP meeting" to plan A.S.' program for high school. *Id.*, ¶ 15. Steven Deon, the Child Study Team Case Manager at West Morris Central High School participated in that meeting. *Id.*; A152.

As Barnstable indicated that A.S. required a more therapeutic placement, her April 23, 2021 IEP called for her to remain at Barnstable for the remainder of the 2020-2021 school year and be placed in a private out-of-district therapeutic day school for ninth grade. *Id.,* ¶ 16; A156, A164-165, A171 and A173. The IEP stated that "the district will send records to out of district placements with a therapeutic component to determine an appropriate program for [A.S.]'s freshman year of high school." *Id.*, ¶ 16; A173. The IEP continued to provide for "curb to curb" transportation. *Id.*, ¶ 16; A171.

After considering and discussing her options for ninth grade, on June 22, 2021, A.S.'s parents toured Cornerstone Day School, one of the therapeutic day schools recommended during the April 23 meeting. *Id.*, ¶ 17; A173. After their visit, they

consented to sending A.S.'s records to Cornerstone for consideration. *Id.*, ¶ 17.

Meanwhile, on July 1, 2021, WMRHSD assumed responsibility for A.S.'s IEP. *Id.*, ¶ 18. Because her parents and private therapist believed she required programming to address her social and emotional needs during the summer and pending a new placement, and her parents were also concerned that a back-up plan should be in place in case Cornerstone did not work out as a placement, they requested an "emergency" IEP team meeting to discuss her potential placement at Stepping Forward during the summer and potential placement at West Morris Central High School as a fallback in September. *Id.*, ¶ 19.

In response, the West Morris Central High School Child Study Team convened an IEP team meeting on July 14, 2021 to "hear" the parents "concerns" and input from A.S.'s therapist, but they denied the parents' request for an interim placement at Stepping Forward and did not change the plan to place A.S. in an out-of-district therapeutic day school in the new school year. *Id.*, ¶ 20.

There was a discussion about sending A.S.'s records to Sage Day High School in Boonton, New Jersey, for consideration. *Id.*, ¶ 21. Mr. Deon mentioned that if A.S. were not placed in a new out-of-district placement in time for the start of school in the

fall, she would receive Home Instruction, but no one mentioned
anything about her transportation. *Id.*

After the meeting, her parents did not receive written
notice about any decisions made at the meeting or a copy of
A.S.'s IEP. *Id.*, ¶ 22. Mr. Deon and A.S.'s parents moved forward
with the plan to refer A.S. to Sage. *Id.*, ¶ 23. On or about July
15, 2021, A.S.'s parents consented to sending A.S.'s school
records to Sage. *Id.* Sage's intake process was completed and
Sage accepted A.S. Her parents and Mr. Deon agreed to place her
there for ninth grade. *Id.*

Although school began on August 25, 2021, and A.S.'s
placement would not begin until September 10, 2021, the District
never offered nor did A.S. ever receive Home Instruction. *Id.*, ¶
24.

The District secured the placement at Sage and A.S. was
scheduled to start there on September 10, 2021. *Id.*, ¶ 25. On
September 8, 2021, Mr. Deon advised J.S. that the Child Study
Team had reached out to the District's Transportation Department
to let them know of the start date so they could arrange her
transportation. *Id.*

On September 9, 2021, J.S. inquired of Mr. Deon the status
of A.S.'s placement and transportation arrangements so that they
could plan if they had to transport her to Sage themselves. *Id.*,
¶ 26. He responded by email at 2:57 p.m. that as of that time "I

have received no confirmation regarding transportation for tomorrow … If there is a way to have [A.S.] driven tomorrow, I believe that would be the best option at this time." *Id.*; A177.

A.S. did start at Sage on September 10, but WMRHSD did not arrange for transportation to begin on that day and her father had to drive her to and from Sage. *Id.*, ¶ 27. In fact, he had to continue driving her to and from Sage, spending approximately three hours per day doing so (about 45 minutes each way), until October 8, 2021, after which WMRHSD finally secured transportation for her. *Id.*, ¶ 28.

J.S. repeatedly complained about the District's failure to transport A.S. to Sage. *Id.*, ¶ 29. Initially, Mr. Deon assured her that the District was attempting to resolve the problem and make the necessary arrangements. *Id.*, ¶ 30. In an email on September 20, 2021, Michael Reinknecht, WMRHSD's Director of Special Education, stated that the "district transportation coordinator [Nancy Genuardi] would, and will, provide transportation were a single vendor or in-district resource available, but despite Mrs. Genuardi's efforts, no vendors have bid on the route." *Id.*; A181.

However, just two days later, in an email dated September 22, 2021, Mr. Reinknecht claimed that "the District is not responsible to transport [A.S.]" to Sage because in a previously undisclosed and apparently newly discovered IEP dated July 14,

2021, it stated, "Transportation is not required." A186; A189 (draft IEP dated July 14, 2021). *Id.*, ⁋ 31. Mr. Reinknecht contended that A.S. was not entitled to any transportation because the IEP "went into effect on the 16th day following the [July 14] IEP meeting" "because you [the parents] did not file for due process to block its implementation." *Id.*, ⁋ 32; A186.

Although A.S.'s parents never received a copy of the July 14 IEP, in an email dated September 23, 2021, Mr. Reinknecht claimed that "this IEP was sent to you via regular post," A227, but he did not explain how he supposedly knew this. *Id.*, ⁋ 33. In response to J.S.'s email inquiry on the following day about the same, Mr. Deon could only say, "[a]n IEP should have been sent in the mail." *Id.*, ⁋ 33; A230.

Notwithstanding his position regarding A.S.'s transportation, Mr. Reinknecht indicated that the District would "continue[] to try to identify a vendor to provide transportation for [A.S.] that can pick her up at your residence," A186, and offered until then "courtesy transportation" with a pick up and drop off at the Washington Township Municipal Building, *id.*, which is about a third of a mile from A.S.'s home. *Id.*, ⁋ 34.

The District had secured a vendor, Cassidy Transportation, to drive A.S. to school, but it reportedly refused to drop her off and pick her up in front of her home for safety reasons.

*Id.,* ¶ 35. This was surprising since Cassidy had transported
A.S.'s brother for WMRHSD for three school years from September
2017 through June 2020 to and from an out-of-district placement,
picking him up and dropping him off in a van in front of their
home for the entire time. *Id.; see also,* Exhibit A to the
Verified Complaint (excerpt from A.S.'s brother's November 14,
2019 IEP showing curb to curb transportation).

Moreover, the District's own website states that:

> A student with an IEP that requires transportation to
> school will ride the bus from their home to school,
> even if he/she is non-remote. The student does not
> need to apply for subscription busing. The IEP must
> state in writing that the student is required to ride
> the bus to school.

WMRHSD Website, Transportation Q & A.[2]

Although A.S.'s parents had no choice but to accept the
offered transportation, the drop off and pick up location at the
Municipal Building is not appropriate because Schooley's
Mountain Road is a busy road with no sidewalk or shoulder on
either side for pedestrians to safely traverse. *Id.,* ¶ 37. It
would be unsafe for A.S. to walk to and from the Municipal
Building every school day morning and afternoon. *Id.* This is

---

[2]
https://www.wmrhsd.org/cms/One.aspx?portalId=65464&pageId=158193
#If%20my%20child%20has%20an%20IEP%20(Individualized%20Learning%2
0Plan)%20that%20includes%20a%20requirement%20for%20busing,%20wil
l%20he/she%20be%20offered%20busing%20even%20if%20he/she%20is%20n
on-remote?

particularly so given her emotional and cognitive disabilities.

*Id.* As explained by Sarah Amador, Ph.D., her therapist:

> Her most prominent symptoms include very rigid
> thinking patterns with limited ability to make
> cognitive shifts, poor ability to transition from one
> activity/location to another, dissociative episodes
> resulting in a disconnect from her current
> surroundings, refusal to comply to directives/commands
> in the home and school setting, impaired functioning
> in verbal and nonverbal interactions,
> negative/catastrophic thinking style including
> impaired emotional regulation and inability to sustain
> attention to tasks. Since last spring, it was
> determined by the IEP team that Abigail required a
> more therapeutic program and since September, she has
> been attending the Sage Day School.  With respect to
> transportation to and from school, Abigail resides on
> a very treacherous, mountainous street with no
> shoulder for a pedestrian to walk along.  With all
> things considered (physical danger of street,
> Abigail's tendency to dissociate, and increased need
> for therapeutic support), it is deemed necessary for
> Abigail's physical and emotional safety that
> transportation is provided door to door.

A232.

While A.S.'s father has been able to drop her off and pick
her up at the Municipal Building since this transportation began
on October 11, 2021, this is only because he was laid off in
August from a full-time position he had as a Senior Program
Associate at a philanthropic foundation for the last ten years.
*Id.,* ¶ 39. He is looking for a new job as the family requires two
incomes. *Id.,* ¶ 40. He expects to start working full-time again
soon. *Id.* When he does, he will no longer be able to drop off

and pick up A.S. at the Municipal Building and it will be unsafe for her to walk to and from there along Schooley's Mountain Road. *Id.* She will no longer be able to attend Sage, unless she is provided curb to curb transportation by WMRHSD. *Id.*

Because the family lives approximately 4.6 miles from West Morris Central High School, if A.S. were not required by the District to attend Sage because of her disabilities, she, like all other high school students who live on Schooley's Mountain Road, would receive curb to curb transportation pursuant to the District's transportation policies. *Id.*, ¶ 41. This would also be required under New Jersey's education laws and regulations that require school districts to "provide transportation to public school students who reside remote from their assigned school of attendance."[3] N.J.S.A. 18A: 39-1; N.J.A.C. 6A:27-1.3 (a high school student is considered to live remote from school if they live more than two and one-half miles from school). *Id.*, ¶ 42.

Indeed, during his freshman year, when A.S.'s brother attended West Morris Central High School, he was picked up and dropped off in front of their home by a full-sized yellow bus just like all other public high school students who live on Schooley's Mountain Road. *Id.*, ¶ 43.

---

[3] The District's transportation policies and New Jersey's school transportation law do not necessarily require curb to curb transportation, but since they are required to transport students safely, all general education students who live on Schooley's Mountain Road receive curb to curb transportation since it is unsafe to walk along the road.

On October 5, 2021, A.S.'s parents requested a due process
hearing to challenge the Board's refusal to provide "Curb to
Curb" transportation as called for by her April 23, 2021 IEP,
A149, and to be reimbursed for transporting A.S. to and from
Sage from September 10 through October 8, 2021. *Id.*, ¶ 44. A11-
16.

After that, on October 12, 2021, the District convened a
"30 Day Review" IEP meeting to formalize A.S.'s placement at
Sage. *Id., ¶ 45*. At that meeting, the Child Study Team proposed
to change A.S.'s transportation from "Curb to Curb" as provided
for in her April 23, 2021 IEP to transportation with the "pickup
and drop-off location" at the Washington Township Municipal
Building. *Id.*; A64.

A.S.'s parents expressed their concerns in the IEP:

> Mr. and Mrs. [S] are extremely concerned with the
> pick-up and drop-off location of the Washington
> Township municipal building as there are no sidewalks
> and the road is extremely dangerous and heavily
> traveled. Should there be no one to drop off or pick
> up [A.S.] from the Washington Township municipal
> building, she would be unable to go to school.

*Id.*, ¶46; A36.

Although the Board did not provide a formal response in the
notice of rights section of the IEP, A68, Mr. Deon did explain
in an email that the District would not allow him to include
curb to curb transportation on an IEP, regardless of the

student's circumstances, unless the student had a physical disability. *Id.,* ⁋ 47. He wrote:

> Barring any physical disabilities, I am unable to put any type of curb-to-curb/home pickup in any student's IEP. I have included "at this time" in case anything were to change for the future. If that is indeed the case and I am given a different directive, I would be happy to amend accordingly. That being said, I have still outlined your concerns regarding this matter. If you would prefer, I could remove this comment section, though that would also not denote a curb-to-curb scenario, it would just specify that transportation is mandated. If you are able to reach a different agreement with the transportation company, we can go from there as well.

> *Id.*; A236.

Even though, under IDEA's stay-put provision, the District was required to maintain A.S.'s then-current educational placement, which pursuant to her April 23, 2021 IEP includes curb to curb transportation, and could not implement the change proposed on October 12, 2021 without her parents' consent - since her due process petition was filed before then on October 5, 2021 - the District refused to implement or acknowledge responsibility for the curb to curb transportation called for in the April 23, 2021 IEP pending a due process hearing. *Id.,* ⁋ 48.

On October 25, 2021, the parties engaged in mediation, but they were not able to resolve their dispute. On or about November 9, 2021, and through early December, the parties engaged in settlement discussions facilitated by an ALJ, but they were still unable to resolve their dispute. *Id.,* ⁋50.

15

On January 5, 2022, A.S. filed a motion for emergent relief to enforce stay-put seeking an order compelling the District to implement the curb to curb transportation in A.S.'s stay-put IEP. *Id.*, ⁋ 51. In support of that motion, A.S. submitted the Certification of J.S. and Exhibits attached thereto. A19-237. In support of its opposition, the Board submitted the Affidavit of Michael Reinknecht, Director of Special Education, A238. In support of her reply, A.S. submitted the Supplemental Certification of J.S. A242.

The matter was assigned to Judge Tiscornia for a hearing on the stay-put motion. *Id.*, ⁋ 52. Oral argument, without live testimony, was held on January 25, 2022. *Id.*, ⁋ 55. On January 26, 2022, Judge Tiscornia issued a decision denying A.S.'s motion. A1. To date, a plenary hearing on the underlying dispute regarding A.S.'s transportation has not been scheduled. *Id.*, ⁋ 59.

## JURISDICTION OVER THIS INTERLOCUTORY STAY-PUT APPEAL

Courts in this District have been willing to address stay-put decisions on an interlocutory basis. *Cinnaminson Twp. Bd. of Educ. v. K.L.*, Civ. A. No. 16-3586, 2016 WL 4212121, at *4 (D.N.J. Aug. 9, 2016). "As such, this Court properly reviews [an] ALJ's stay-put determination on an interlocutory basis." *Id.* Moreover, stay-put cases, generally, as is the case here,

do not require exhaustion of administrative remedies because they present a purely legal question regarding the interpretation of IDEA's stay-put provision. *Pardini v. Allegheny Intermediate Unit*, 420 F.3d 181, 192, n. 13 (3d Cir. 2005).

### STANDARD OF REVIEW IN IDEA STAY-PUT CASES

With regard to IDEA, courts apply a modified de novo review standard to appeals from ALJ findings. *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). This standard of review provides due weight to factual findings by the ALJ, but allows for de novo review of issues of law. *In re Educ. Assignment of Joseph R.*, 318 Fed. Appx. 113, 117 (3d Cir. 2009). While an ALJ's credibility determination based on live testimony is due special weight, *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010), no such deference is due here since the ALJ did not hear any testimony. Moreover, "a stay put decision [is] a legal question as established in the case law." *R.S. v. Somerville Board of Education,* 2011 WL 32521, at *8 (D.N.J. Jan. 5, 2011). As the operative facts in this case are not in dispute, the legal questions pertaining to the "stay-put" decision are reviewed by this Court de novo.

### ARGUMENT

I.  **THE ALJ'S ORDER DENYING STAY-PUT RELIEF SHOULD BE REVERSED BECAUSE HE ERRONEOUSLY INTERPRETED THE TERM "CURB TO CURB TRANSPORTATION" AS PERMITTING THE DISTRICT TO PICK UP AND**

**DROP-OFF A.S. A THIRD OF A MILE AWAY FROM HER HOME ALONG A DANGEROUS MOUNTAIN ROAD**

Congress enacted IDEA to ensure that all children with disabilities are provided a "free appropriate public education" (FAPE) which emphasizes special education and related services designed to meet their unique needs and to assure that the rights of such children and their parents are protected. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239 (2009). FAPE consists of "special education and related services" that (A) "have been provided at public expense, under public supervision and direction, and without charge," (B) "meet the standards of the State educational agency," . . . , and (D) "are provided in conformity with the 'individualized education program'" ("IEP") required under 20 U.S.C. § 1414(d). 20 U.S.C. § 1401(9).

The IEP is "the centerpiece of the statute's education delivery system for disabled children." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017), citing *Honig v. Doe*, 484 U.S. 305, 311 (1988). It consists of a "comprehensive plan" prepared by a child's "IEP Team," which "must be drafted in compliance with a detailed set of procedures. *Id.,* citing 20 U.S.C. § 1414(d)(1)(B). "These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances." *Id.,* citing 20 U.S.C. § 1414. "The IEP is the

means by which special education and related services are 'tailored to the unique needs' of a particular child. *Id.,* citing *Rowley*, 458 U.S. at 181.

Transportation is a "related service" under IDEA. 20 U.S.C. § 1401(26). In New Jersey, a school district must provide a student with disabilities transportation whenever the student has been placed in an "out-of-district" placement, N.J.A.C. 6A:14-3.9(a)(7); N.J.A.C. 6A:27-5.1(a)(2). And, "[u]nder no circumstances shall the parent or guardian of the student with disabilities be responsible for payment of the cost of transportation services required by the student's IEP." N.J.A.C. 6A:27-5.1(b)(2).

While a school district is not required to provide "curb to curb" transportation to every student with a disability who requires transportation, the decision of whether to transport a child with a disability from his home or a local bus stop to a special education program must be made based on the "child's particular needs consistent with the services identified in the IEP developed in concert with parents and appropriate professional personnel." *Letter to Smith*, 211 IDELR 191 (U.S. Dept. of Educ., March 17, 1980) (attached).

In developing a student's IEP, a State must comply with procedural safeguards designed to protect the rights of children with disabilities and their parents. *See* 20 U.S.C. § 1415. These

19

procedural safeguards "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig v. Doe*, 484 U.S. at 311-312. They include:

> the right to examine all relevant records pertaining to the identification, evaluation, and educational placement of their child; prior written notice whenever the responsible educational agency proposes (or refuses) to change the child's placement or program; an opportunity to present complaints concerning any aspect of the local agency's provision of a free appropriate public education; and an opportunity for 'an impartial due process hearing' with respect to any such complaints.

> [*Id.* at 312 (citation omitted).]

A critical safeguard is afforded by IDEA's "stay-put" provision, which mandates that, "during the pendency of any proceedings conducted pursuant to this section, unless the [school district] and the parents otherwise agree, the child shall remain in the *then-current educational placement* of the child." 20 U.S.C. § 1415(j) (emphasis added). Accordingly, "pending the outcome of a due process hearing . . . or any administrative or judicial proceeding, no change shall be made to the student's classification, program or placement unless both parties agree." N.J.A.C. 6A:14-2.7(u).

Should a dispute arise concerning the student's placement pending the outcome of a due process proceeding, the parent may

file an application for emergent relief to resolve the issue.
N.J.A.C. 6A:14-2.7(r)iii. Although fashioned as an application
for emergent relief, "[t]he stay-put provision functions as an
automatic preliminary injunction which dispenses with the need
for a court to weigh the factors for emergent relief such as
irreparable harm, and likelihood of success on the merits, and
removes the court's discretion regarding whether an injunction
should be ordered." *T.D. o/b/o J.D. v. Glouceser County
Vocation Bd. of Educ.*, OAL Dkt. No. EDS 05282-19, 2019 WL
2998770, at *7 (OAL, May 13, 2019), citing, *Drinker v. Colonial
Sch. Dist.*, 78 F.3d 859 (3d Cir. 1996). "Once a court ascertains
the student's current educational placement, the movants are
entitled to an order without satisfaction of the usual
prerequisites to injunctive relief." *Drinker*, 78 F.3d at 864.

   "The Supreme Court has described the language of section
[1415(j)] as 'unequivocal,' in that it states plainly that 'the
child shall remain in the then current education placement.'"
*Drinker*, 78 F.3d at 864, citing *Honig*, 484 U.S. at 323. The
stay-put rule reflects "Congress's conclusion that a child with
a disability is best served by maintaining her educational
status quo until the disagreement over her IEP is resolved,"
*M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 118 (3d Cir. 2014)
(citation omitted), and "preventing local educational
authorities from unilaterally changing a student's existing

21

educational program." *Michael C. v. Radnor Twp. Sch. Dist.*, 202 F.3d 642, 650 (3d Cir. 2000); *see also, M.R. v. Ridley*, 744 F.3d at 125 ("[T]he stay put provision acts as a powerful protective measure to prevent disruption of the child's education throughout the dispute process") (citation omitted). IDEA's stay put provision "protects the status quo of a child's educational placement while a parent challenges a proposed change to, or elimination of, services." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 72 (3d Cir. 2010).

When an issue arises with respect to the application of IDEA's stay-put provision, the primary task of the court is to simply identify "the then current educational placement" when the dispute first arose. *See Drinker*, 78 F.3d at 865; *See also*, 34 C.F.R. § 300.116(b)(2) (The child's "placement" is "based on the child's IEP.") "[T]he dispositive factor in deciding a child's 'current educational placement' should be the [IEP] actually functioning when the 'stay put' is invoked." *Drinker,* 78 F.3d at 867 (internal quotes and citations omitted). Generally, that is the child's last agreed upon IEP. *Id*. at 862, n. 3 ("The district may not alter, unilaterally, an agreed upon … IEP"); *M.G. v. New York City Dep't of Educ.*, 982 F. Supp. 2d 240, 246–47 (S.D.N.Y. 2013) ("Normally, the 'then current placement' is 'the last agreed upon placement at the moment when the due process proceeding is commenced.'")

Here, the ALJ correctly concluded that A.S.'s April 23, 2021 IEP, including curb to curb transportation, constitutes her "stay-put" placement, A7, but he nevertheless denied her relief even though the District refuses to pick her up and drop her off in front of her home because he concluded, without hearing any live testimony, that "the current transportation arrangement was not implemented in order to remove or otherwise change the curb-to-curb transportation provision, but rather, a resolution to execute said provision as safely as possible." *Id.*

However, it was improper for the ALJ to deny A.S. stay-put simply because he did not believe the District's failure to comply with the stay-put IEP was caused by improper intentions. As discussed above, courts have interpreted IDEA's stay-put provision as unequivocal. *Drinker,* 78 F.3d at 864, citing *Honig,* 484 U.S. at 323. "Once a court ascertains the student's current educational placement, the movants are entitled to an order without satisfaction of the usual prerequisites to injunctive relief." *Drinker,* 78 F.3d at 864. Hence, once the ALJ determined that the A.S.'s stay-put IEP included curb to curb transportation, he should have ordered the District to provide A.S. curb to curb transportation.

This is not to say that safety can never be considered when implementing a student's IEP, however, a school district cannot unilaterally disregard a student's IEP simply because it

believes it is unsafe. If a school district cannot effectively address an unsafe situation through the normal IEP process, school officials can seek injunctive relief under IDEA's due process procedures bearing in mind that IDEA's stay put provision "effectively creates a presumption in favor of the child's current educational placement which school officials can overcome only by showing that maintaining the child in his or her current placement is substantially likely to result in injury either to himself or herself, or to others." *Honig v. Doe*, 484 U.S. at 328. Here, the District did not avail itself of these procedures and, as discussed further below, it has not shown that continuing to pick up and drop off A.S. in front of her home, as has happened safely for the past thirteen years, would be substantially likely to result in injury to her or anyone else. Thus, this case is similar to *Anchorage Sch. Dist. v. N.S. ex rel. R.P.*, No. 3:06-CV-264 JWS, 2007 WL 8058163 (D. Alaska Nov. 8, 2007), where a school district tried to avoid it's stay-put obligation to provide door-to-door transportation contending that it was too dangerous to meet and return the student to his door. The court concluded that, "[a]ssuming, without deciding that there could be a 'it is too onerous' exception to the IDEA, the facts here would not support its application." *Id.* That is the case here.

24

The ALJ also denied A.S. relief because he concluded that the District was in fact complying with her stay-put IEP since he found that the term, "curb to curb," "suggests on its face that the pick-up occur at the nearest and safest curbside location, which, in the present case, appears to be the municipal building a few hundred yards away[4] from the petitioner's front door." A7. However, the ALJ's interpretation of the term lacked any factual or legal basis and was inconsistent with the facts of this case and the term's common usage in the areas of special education and disability services.

The District itself implicitly concedes that curb to curb transportation in an IEP means the student will be picked up and dropped off in front of their home. It did not argue that it was complying with the curb to curb transportation provision in A.S.'s IEP, but rather only that it could not comply with it (Part III of its opposition brief before the OAL was headed, "The District is Unable to Provide 'Curb to Curb' Transportation to Transport A.S. to Sage.")[5] Communications with Steven Deon, A.S.'s case manager, also reflected the District's understanding that curb to curb meant pick-up and drop-off in front of the home, and not at the Municipal Building. In response to J.S.'s

---

[4] The ALJ refers to the municipal building as being "few hundred yards away" from A.S.'s home, but it is undisputed that it is about a third of a mile away, Verified Compl., ⁋ 34; A241, ⁋ 19, which is closer to six hundred yards.
[5] Plaintiffs did not include briefs filed with the OAL in the Appendix submitted with this application.

inquiry as to whether the October 12, 2021 proposed IEP could say that, "although the drop-off would be at that time the Municipal Building, the goal would be to have the pick-up and drop-off be their home," A236, Deon answered that he was "unable to put any type of curb-to-curb/home pickup in any student's IEP." *Id.* If the term "curb to curb" actually encompassed a drop-off and pick-up at the Municipal Building, there would have been no reason for it to have been removed from the IEP in the first place or otherwise to not include it in the October 12 IEP. Deon also referred to the terms "curb to curb" and "home pickup" together as a single concept, "curb-to-curb/home pickup," suggesting the two phrases mean the same thing and can be used interchangeably.

It is also clear that both WMRHSD and WTSD have historically used the term "curb to curb" transportation in IEPs to mean pick-up and drop-off in front of the home. For example, for three school years, from September 2017 through June 2020, WMRHSD included curb to curb transportation in A.S.'s brother's IEP and implemented that IEP by providing transportation with a pick-up and drop-off in front of the family home on Schooley's Mountain Road. Verified Compl., ¶ 35; Exhibit A (excerpt from brother's November 14, 2019 IEP, including transportation section).

Likewise, during the 2020-2021 school year, WTSD included curb to curb transportation in A.S.'s IEP and it implemented that IEP by providing transportation with a pick-up and drop-off in front of the family home as well. Verified Compl., ¶¶ 12-14; A112 and A144.

Curb to curb transportation is also a term of art understood widely in the area of special education and disability services to mean transportation with a pick-up and drop-off in front of the origin and destination locations. Significantly, the federal Transportation regulation defining terms related to transportation services for individuals with disabilities provides that "Origin-to-destination service" means providing service from a passenger's origin to the passenger's destination," 34 C.F.R. § 37.3, and "[a] provider may provide ADA complementary paratransit in a curb-to-curb or door-to-door mode." *Id.* (under 34 C.F.R. § 37.129, "complementary paratransit service for ADA paratransit eligible persons shall be origin-to-destination service.") Indeed, in order to meet the requirements of the Americans with Disabilities Act and federal Transportation regulations, the New Jersey Transit Corporation created "Access Link" paratransit bus service, which offers such "curb-to-curb bus service" for qualifying disabled people. *Sell v. New Jersey Transit Corp.*, 298 N.J. Super. 640, 642 (App. Div. 1997). Such service would have to transport a qualifying person

27

with a disability from their point of origin to their destination, and the individual would not be required to walk a third of a mile to a bus stop to access the service.

The ALJ's conclusion that the Municipal Building parking lot was the "nearest and safest curbside location" for A.S.'s pick-up and drop-off was also inconsistent with the undisputed evidence. It was undisputed that requiring A.S. to walk a third of a mile along a busy mountain road that has no sidewalk or shoulder in order to access the transportation to her school would be very dangerous (this was especially so given her psychological disabilities, Verified Compl., ¶ 38). Hence, it is impossible to conclude that having her picked up and dropped off at the Municipal Building would be safer than having her picked up and dropped off in front of her house, unless it is assumed that her parents will transport her to and from the Municipal Building.

However, under IDEA, FAPE consists of special education and related services that, among other things, "have been provided at public expense, under public supervision and direction, and without charge," 20 U.S.C. § 1401(9), and New Jersey's special education regulation provides that "[u]nder no circumstances shall the parent or guardian of the student with disabilities be responsible for payment of the cost of transportation services required by the student's IEP." N.J.A.C. 6A:27-5.1(b)(2). It

would, therefore, be a violation of IDEA and New Jersey's special education regulation to require A.S.'s parent to forgo employment in order to transport A.S. for part of her bus route so that she can receive special education services. As noted in *Anchorage Sch. Dist.*:

> Financial considerations aside, a disabled child's parents always could hire somebody to complete the entire transportation transaction. Basically what the hearing officer did was to conclude that the district must complete the transportation transaction. Leaving N.S. in the driveway or at another supervised location does not do that. Given the facts and circumstances here, door-to-door service is the only option in the record which allows N.S. to enjoy the benefit of his special education.

*Id.*, 2007 WL 8058163, at *9.

Furthermore, the undisputed evidence showed that for at least thirteen years WTSD picked up and dropped off A.S., her brother and other students attending public schools from in front of their homes along Schooley's Mountain Road, WMRHSD picked up and dropped off A.S.'s brother from their home when he attended West Morris Central High School during his freshman year, and this continues today. Verified Compl., ¶¶ 11 and 43. Additionally, both A.S. and her brother were for four years picked up and dropped off in front of their home by vendors contracted by WTSD and WMRHSD to transport them to out-of-district special education placements. *Id.*, ¶¶ 12-14 and 35. In fact, the Board's own website notifies parents that "[a] student

29

with an IEP that requires transportation to school will ride the bus from their home to school, even if he/she is non-remote."[6] Consequently, the ALJ's finding that it was safer to have A.S. walk to the Municipal Building than have her picked up and dropped off at her home is inconsistent with the undisputed evidence that both local school districts have regularly picked up and dropped off both students in general education and students in special education from in front of their homes along Schooley's Mountain Road for years.

The only evidence that it was not safe to pick-up or drop-off A.S. from her home consisted a vague statement in the Affidavit of Michael Reinknecht that was not based on personal knowledge. He claimed that a vendor who they hired to service A.S.'s bus route, Cassidy Transportation, refused to pick up or drop off A.S. in front of her home for unspecified "hazardous conditions" and "safety concerns," A240-241, ¶¶ 15-19, but Reinknecht did not explain the vendors concerns and it is not even clear that he ever spoke to the vendor who allegedly refused to pick up A.S. in front of her home. The claim is also questionable because Cassidy had picked up and dropped off A.S.'s brother from in front of their home for three years from September 2017 through June 2020. Verified Compl., ¶ 35.

---

[6] *See* link to website at n. 2.

The ALJ also concluded that "any perceived deviation from the curb-to-curb plan described in the April, 2021, 'stay put' IEP would be a [sic] minor, and one made only in the interest of safety." A8. However, under *DeLeon v. Susquehanna Cmty. Sch. Dist.*, 747 F.2d 149 (3d Cir. 1984), a school district may not unilaterally change one of the basic constituent elements of a student's IEP, including transportation, if the change "is likely to affect in some significant way the child's learning experience." *Id.* at 153. Here, unless the District is allowed to unlawfully require that A.S.'s parents to transport her to and from the Municipal Building every day so she can receive special education and related services, it is clear that the change from curb to curb transportation to transportation with a pick-up and drop-off at the Municipal Building will make it impossible for A.S. to go to school and thus cause a significant change in her learning experience. The denial of curb to curb transportation here is similar in effect to the denial of door-to-door transportation in *Anchorage* where the court found, "there is no question that N.S. cannot benefit from his special education if he is not transported to and from school, because, regardless of the cause, the plain fact is that he cannot otherwise get to school." *Id.*, 2007 WL 8058163, at *8.

Finally, the ALJ also denied A.S. stay-put relief because he concluded that the curb to curb transportation in A.S.'s stay

put IEP "is currently being implemented to the best of the district's ability." A8-9. However, as discussed before, the issue in the context of a motion to enforce stay put is not whether a school district is doing its best, but whether it in fact is implementing the IEP. Here, the undisputed evidence shows that the District is not.

Furthermore, the ALJ's conclusion – again, without hearing live testimony - that the District was actually doing its best to implement the IEP is inconsistent with the undisputed evidence. The claim that the Board cannot implement curb to curb transportation for A.S. is belied by the regular practice of both WMRHSD and WTSD of picking up and dropping off near their homes all students who attend public schools and live near A.S. on Schooley's Mountain Road and the fact that A.S. and her brother were for the last four years picked up and dropped off in front of their homes when being transported to and from their out-of-district placements.

Furthermore, the only evidence of the Board's alleged efforts to secure transportation for A.S. consisted of vague and unreliable statements in Reinknecht's Affidavit. He claimed that on three occasions between September 10 and October 1, 2021, the District put A.S.'s bus route out for bid to various venders, A240-241, ¶¶ 15-18, but he offers no details about the process (e.g., he does not say specifically from whom bids were

solicited and what efforts, if any, were made to encourage bids for curb to curb transportation), and it is not likely that he even has personal knowledge of the transportation bidding process followed in this case since it is usually the Transportation Department, in this case led by the Transportation Coordinator, Nancy Genuardi, that handles the transportation procurement process. A181 (email from Reinknecht identifying Genuardi as person trying to secure transportation for A.S.)

Moreover, J.S. called two vendors who had recently transported A.S. to and from the Newmark School and Barnstable Academy with the pick-up and drop-off in front of their home, and they said that the District had not solicited bids from them. A243-244, ¶ 10-12. Hence, it appears that the District did not solicit bids from all available vendors, including some likely to provide curb to curb transportation, and the District has not made any efforts since October 1 to secure curb to curb transportation for A.A.

Finally, as it has been five months since A.S. began attending Sage in September 2021, if no vendor were available to transport A.S. with a pick-up and drop-off at her home, the District could have by now purchased its own vehicle and hired a driver to transport A.S. to and from Sage itself if it wished to comply with A.S.'s stay-put IEP.

33

**CONCLUSION**

For all these reasons, the ALJ's order denying A.S. stay-put relief should be reversed and the Board should be ordered to comply immediately with A.S.'s stay-put IEP and implement the curb to curb transportation included therein by picking her up and dropping her off in front of her home when transporting her to and from school during the pendency of the special education due process hearing regarding the parties' underlying transportation dispute.

Respectfully submitted,

s/David R. Giles
Plaintiffs' Attorney

Dated: February 3, 2022

**211 IDELR 191**

**211 LRP 7068**

## Letter to Smith
## Bureau of Education for the Handicapped
### N/A
## March 17, 1980

**Related Index Numbers**

**515.015 Methods/Means of Transportation**

### Judge / Administrative Officer

**William D. Tyrrell, Chief, Policy Section, Bureau of Education for the Handicapped**

### Case Summary

Pub. L. 94-142 does not address the issue of bus stops in providing transportation as a related service to handicapped children; the decision whether to transport a child from his home or from a local bus stop must be made on an individual basis in process of drawing up child's IEP.

### Full Text

Keith C. Smith, Director of Special Education, Department of Education, Charleston, WV 25305

Text of Inquiry

I have recently talked to Ron Kowalski regarding a pressing issue we are facing in West Virginia relating to the transportation of a handicapped child.

The school system has been asked to provide transportation for a child which includes traveling on a private driveway. Ron indicated that he had talked with Jerry Vlasak and it was their opinion that a school system was not required to provide transportation over a private roadway.

The position taken by the Department of Education over past years has been the same as stated by Ron. Counties are not required to provide transportation to any children beyond public roadways. The provision of transportation on private roads has resulted in requests for the school system to repair and maintain roadways. The provision of transportation on private roads has resulted in requests for the school system to repair and maintain roadways. Such repairs and maintenance have been viewed as neither a legal nor appropriate expenditure of public funds, unless resulting from a specific regulatory or judiciary finding.

I am at this time requesting the position of BEH on provision of transportation on private property in writing. I am also asking that you respond to questions submitted in an earlier correspondence from Tom Long, addressed to Theodore Becker (copy attached). To date we have had no response.

Your assistance in this matter would be greatly appreciated.

[Enclosed Letter]

[July 9, 1979]

I would appreciate an interpretation/policy statement concerning the provision of related services as outlined in the regulations for P.L. 94-142, particularly in relation to providing transportation to and from school.

West Virginia laws governing school transportation services indicate that, "The boards, subject to the provisions of this chapter and the rules and regulations of the state board, shall have authority: (6)(a) To provide at public expense adequate means of transportation, including transportation across county lines, for all children of school age who live more than two miles distance from school by the nearest available road . . ." It appears from this statement that county boards in West Virginia would not be mandated to provide transportation to and from school for all children who live less than two miles from school.

In considering West Virginia laws governing school transportation services and the provision of transportation as a related service under P.L. 94-142, would a county board of education in West Virginia be in violation of the intent of P.L. 94-142 if it denied transportation services to a handicapped child who lived less than two miles from school? Is the intent of

Copyright © 2020 LRP Publications

the regulations for P.L. 94-142 to provide transportation for handicapped children no matter what distance the child might live from school

Secondly, in terms of establishing bus stop locations, would a county board of education be mandated to pick up the child at his/her home or could the county board establish the bus stop location?

I will be eager to receive your response. Thank you for your attention to this matter of concern.

Text of Response

Please accept our apologies for the delay in response to your letter of November 8, 1979. Since you had previously discussed this matter with Jerry Vlasak and Ron Kowalski of our Administrative Review Section, and Tom Long had written to Ted Becker of the Field Services Branch, some additional time was needed in terms of collating information about the problem. In your letter you indicated that Ron kowalski had verbally indicated to you that it was Jerry Vlasak's opinion and his that a school system was not required to provide transportation over a private roadway and you were requesting a formal position of BEH on the provision of transportation on private property in writing. Tom Long's letter to Ted Becker asks three specific questions on this issue: (1) Would a county board of education in West Virginia be in violation of the intent of P.L. 94-142 if it denied transportation services to a handicapped child who lived less than two miles from school? (2) Is it the intent of the regulations for P.L. 94-142 to provide transportation for handicapped children no matter what distance the child might live from school? (3) Would a county board of education be mandated to pick up the child at his/her home or could the county board establish the bus location? I would like to respond to your request first and then to Tom Long's questions.

The BEH is aware of varying state statutes and regulations on the question of transportation services for all school-aged children. These statutes are viewed as enabling in nature since they establish limits of public agency responsibility. P.L. 94-142 does not mandate any change in such enabling legislation concerning transportation but does require is as a related service if necessary. At the same time, regulations for 504 prohibiting discrimination on the basis of handicapped provided that the obligation to comply with this part (504) is not obviated or alleviated by the existence of any state or local law or other requirement that, on the basis of handicap, imposes prohibitions or limits upon the eligibility of qualified handicapped persons to receive services. (Reg. 84.10) Consequently, in response to your request for a formal BEH position on this matter, there is none by virtue of the nature of the P.L. 94-142 legislation, but under 504, this question appears subject to review, particularly in terms of an individual handicapped child who may be physically handicapped, and unable to walk less than two miles to school, or lives on a private roadway not served by an existing school bus route. Tom Long's questions are stated largely in terms of P.L. 94-142 intent, and I will respond similarly with the understanding that 504 regulations would appear to obtain more prominently in this matter, particularly with respect to the needs of the visually or physically impaired or multi-handicapped child.

If a nonambulatory handicapped child in west Virginia could not attend a special education program because he/she was physically unable to walk a distance of less than two miles and the county board of education refused to provide or arrange transportation services, that board of education would be in violation of the intent of P.L. 94-142. It is the intent of P.L.94-142 to provide necessary transportation for any handicapped children so that the child will benefit from a free appropriate public education no matter what distance that appropriate program and/or related service might be from the child's residence. In cases of a residential program placement, this transportation, of course, is not required on a daily basis.

In terms of establishing bus stop locations, P.L. 94-142 does not mandate that the child be picked up

Copyright © 2020 LRP Publications

at his/her home, nor does it prohibit the county board from establishing bus stop locations for handicapped children. However, the decision of whether to transport an individual handicapped child from his/her home or a bus stop location to the special education program would have to be made on the basis of the handicapped child's particular needs consistent with the services identified in the IEP developed in concert with parents and appropriate professional personnel. Additionally, as discussed earlier, under 504 requirements, the obligation to provide services to handicapped individuals is not obviated or alleviated by the existence of any state or local law or other requirement, that on the basis of handicap, imposes prohibitions or limits eligibility.

I hope this response proves helpful to you. I would also suggest that you contact the HEW Regional Civil Rights Director for further clarification on this issue. Please let me know if I may be of any further assistance.