David R. Giles
Attorney at Law
34 Rynda Road
South Orange, New Jersey 07079
973-763-1500
davidgiles@davidgileslaw.com

Attorney for the Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| J.S. and S.S., on behalf of A.S., <br><br> Plaintiffs, <br><br> v. <br><br> WEST MORRIS REGIONAL HIGH SCHOOL BOARD OF EDUCATION. <br><br> Defendant. | Case No. 22-cv-00561-EP-ESK <br><br><br> **SECOND AMENDED COMPLAINT** |

Plaintiffs, J.S. and S.S., on behalf of A.S., residing in Long Valley, by way of this Amended Complaint against the West Morris Regional Board of Education, whose administrative offices are located at 10 South Four Bridges Road, Chester, New Jersey 07930, hereby allege as follows:

### <u>JURISDICTION</u>

1.    This court has subject-matter jurisdiction pursuant to 20 U.S.C. § 1415(i)(3)(A) and 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction pursuant 28 U.S.C. § 1367.

## VENUE

2.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because the Defendant resides and the acts and omissions giving rise to Plaintiffs' claims occurred herein.

## PARTIES

3.    Plaintiffs J.S. and S.S. are the parents of A.S.

4.    Plaintiffs are domiciled within the West Morris Regional High School District ("WMRHSD" or "the District").

5.    Defendant West Morris Regional High School Board of Education ("the Board") is the body corporate responsible for the conduct and supervision of the District's public schools.

6.    The Board is a recipient of federal financial assistance from the United States Department of Education, and it is a "public entity" as that term is defined under the Title II of the Americans with Disabilities Act. 42 U.S.C. § 12131(1).

## FACTS

7.    A.S. is a sixteen-year-old "child with a disability" (*See* 20 U.S.C. § 1401(3), defining the terms "child with a disability") classified by the District as eligible for "special education and related services" under the category, Other Health Impaired.

8.    She has been diagnosed with a Major Depressive Disorder, Attention Deficit Hyperactivity Disorder, Dysgraphia,

Nonverbal Learning Disorder, and Unspecified Neurodevelopmental
Disorder.

9.   A.S. lives with her parents and brother in Long
Valley, New Jersey, on Schooley's Mountain Road, where the
family has resided since 2006.

10.   As residents of Long Valley, A.S. and her brother have
fallen within the jurisdiction of the Washington Township School
District ("WTSD") for elementary school (kindergarten through
eighth grade) and WMRHSD for high school.

11.   A.S. is currently a high school sophomore, and her
brother graduated from high school in June 2020.

12.   A.S. was originally classified on December 15, 2014,
when she was seven years old.

13.   At that time, she attended Benedict A. Cucinella
Elementary School, which she attended until June 2018.

14.   After that, she was promoted to Long Valley Middle
School, which she attended until the end of seventh grade in
June 2020.

15.   From the time she was first classified in 2014 through
June of 2020, A.S.'s IEP called for her to receive in-class
support, counseling and a 1:1 aide (in middle school, she also
received pull-out resource program services in math).

16.   Her IEP did not, however, include transportation
because A.S., like her brother, and all other public elementary

school students who live on Schooley's Mountain Road, already received transportation from WTSD.

17.  For thirteen years, from September 2007, when her brother started kindergarten, through June 2020, when A.S. last attended Long Valley Middle School, A.S. and her brother, like all other public elementary school students who lived on Schooley's Mountain Road, were picked up and dropped off every day in front of their home by a full-sized yellow bus operated by WTSD.

18.  Even today, WTSD continues to pick up A.S.'s non-classified eleven-year-old next-door neighbor at her driveway using a full-sized yellow bus.

19.  During his first year at West Morris Regional Central High School, the 2016-2017 school year, A.S.'s brother, like all other high school students who live on Schooley's Mountain Road and attend Central High School, was picked up and dropped off in front of his home by a full-sized yellow bus which WMRHSD secured through a contract with WTSD.

20.  During his last three years of high school, from September 2017 through June 2020, A.S.'s brother was placed by the District in an out-of-district special education placement at the Newmark School in Scotch Plains, New Jersey.

21.   While at Newmark, he continued to receive transportation from the District and he continued to be picked up and dropped off in front of his home.

22.   The District arranged for his transportation through a contract with the Sussex County Regional Cooperative, which used a vendor, Cassidy Transportation, which used a van to drive him to and from school.

23.   In June 2020, at the end of her seventh grade, A.S. was placed by WTSD for eighth grade at the Newmark School as well (although her brother graduated before she got there).

24.   Transportation was added as a related service to her IEP, which indicated that she would receive "curb to curb" transportation.

25.   Beginning in September 2020, A.S. was transported to and from Newmark by WTSD, and she continued to be picked up and dropped off in front of her home.

26.   WTSD arranged for her transportation through a contract with the Educational Services Commission of Morris County, which used a private vendor, K & S Transportation, which used a van to drive A.S. to and from school.

27.   On January 14, 2021, A.S.'s out-of-district placement was changed to Barnstable Academy in Oakland, New Jersey.

28.   As her transportation needs remained the same, she continued to receive "curb to curb" transportation pursuant to her IEP.

29.   Because of the change in her bus route, the Morris County Educational Services Commission changed vendors and A.S. was transported to and from Barnstable by Prestige Bus Service, which continued to pick her up and drop her off in front of her home using a van.

30.   On April 23, 2021, WTSD convened a "Transition IEP meeting" to plan A.S.' program for high school.

31.   Steven Deon, the Child Study Team Case Manager at Central High School participated at that meeting.

32.   As Barnstable concluded that A.S. required a more therapeutic placement, her April 23, 2021 IEP called for her to be placed in a private out-of-district therapeutic day school for ninth grade.

33.   The IEP stated that "the district will send records to out of district placements with a therapeutic component to determine an appropriate program for [A.S.]'s freshman year of high school."

34.   The IEP continued to provide for "curb to curb" transportation.

35.   After considering and discussing her options for ninth grade, on June 22, 2021, A.S.'s parents toured Cornerstone Day

School, a therapeutic day school recommended during the April 23 meeting.

36.   After their visit, they consented to sending A.S.'s records to Cornerstone for consideration.

37.   Meanwhile, on July 1, 2021, WMRHSD assumed responsibility for A.S.'s IEP.

38.   Because her parents and private therapist believed she required programming to address her social and emotional needs during the summer and pending a new placement, and her parents wanted a back-up plan in case Cornerstone did not work out, they requested an "emergency" IEP team meeting to discuss her potential placement at Stepping Forward during the summer and potential placement at Central High School as a fallback in September.

39.   In response, Mr. Deon convened an IEP team meeting on July 14, 2021 to "hear" the parents "concerns" and input from A.S.'s therapist, but the Child Study Team denied the parents' request for an interim placement at Stepping Forward and did not change the plan to place A.S. in an out-of-district therapeutic day school placement in September.

40.   There was a discussion about sending A.S.'s records to Sage Day High School in Boonton, New Jersey, for consideration.

41.   Mr. Deon also mentioned that if A.S. were not placed in a new school in time for the start of new school year, she

would receive Home Instruction, but no one mentioned anything about her transportation.

42.   After the meeting, her parents did not receive written notice about any decisions made at the meeting or a copy of any revised IEP.

43.   After the meeting, Mr. Deon and A.S.'s parents moved forward with the plan to refer A.S. to Sage. On or about July 15, 2021, A.S.'s parents consented to sending A.S.'s school records to Sage.

44.   Sage's intake process was completed and Sage accepted A.S.  A.S.'s parents and Mr. Deon agreed to place her there for ninth grade.

45.   Although the new school year began on August 25, 2021, and A.S.'s placement did not begin until September 10, 2021, the District did not offer and A.S. never received Home Instruction.

46.   The District secured the placement at Sage and A.S. was scheduled to start there on September 10, 2021.

47.   On September 8, 2021, Mr. Deon advised J.S. that the Child Study Team had reached out to the District's Transportation Department to let them know of the start date so they could arrange her transportation.

48.   On September 9, 2021, J.S. inquired of Mr. Deon the status of A.S.'s placement and transportation arrangements so

that they could plan if they had to transport her to Sage themselves.

49.  Mr. Deon responded by email at 2:57 p.m. that as of that time "I have received no confirmation regarding transportation for tomorrow … If there is a way to have [A.S.] driven tomorrow, I believe that would be the best option at this time."

50.  A.S. did start at Sage on September 10, but WMRHSD did not arrange for transportation to begin on that day and her father had to drive her to and from Sage.

51.  In fact, he had to continue driving her to and from Sage, spending approximately three hours per day doing so (about 45 minutes each way), until October 8, 2021, after which WMRHSD finally secured transportation for her.

52.  J.S. repeatedly complained about the District's failure to transport A.S. to Sage.

53.  Initially, Mr. Deon assured her that the District was attempting to resolve the problem and make the necessary arrangements.

54.  In an email on September 20, 2021, Michael Reinknecht, WMRHSD's Director of Special Education, stated that the "district transportation coordinator [Nancy Genuardi] would, and will, provide transportation were a single vendor or in-district

resource available, but despite Mrs. Genuardi's efforts, no vendors have bid on the route."

55.   However, just two days later, in an email dated September 22, 2021, Mr. Reinknecht claimed "the District is not responsible to transport [A.S.]" to Sage because in a previously undisclosed and apparently newly discovered IEP dated July 14, 2021, it stated, "Transportation is not required."

56.   Mr. Reinknecht claimed that A.S. was not entitled to any transportation because the IEP "went into effect on the 16th day following the [July 14] IEP meeting" "because you [the parents] did not file for due process to block its implementation."

57.   Although A.S.'s parents never received a copy of the July 14 draft IEP, in an email dated September 23, 2021, Mr. Reinknecht claimed that "this IEP was sent to you via regular post," but he did not explain how he supposedly knew this.

58.   In response to J.S.'s email inquiry on the following day about the same, Mr. Deon could only say, "[a]n IEP should have been sent in the mail.[1]"

59.   Notwithstanding his position regarding A.S.'s transportation, Mr. Reinknecht indicated that the District would

---

[1] Even if it were true that the IEP had been sent to the parents, the District would still have been required to transport A.S. to school because all students placed in out-of-district placement are entitled to transportation. N.J.A.C. 6A:27-5.1(a)(2).

"continue[] to try to identify a vendor to provide transportation for [A.S.] that can pick her up at your residence," and offered until then "courtesy transportation" with a pick up and drop off at the Washington Township Municipal Building, which is about a third of a mile from A.S.'s home.

60.   The District had secured through a contract with the Sussex County Regional Cooperative, the same vendor that had previously transported A.S.'s brother, Cassidy Transportation, to drive A.S. to school, but it reportedly refused to drop off and pick up A.S. in front of her home for safety reasons.

61.   This was surprising since, as mentioned above, Cassidy had transported A.S.'s brother for three years, picking him up and dropping him off in a van in front of their home the entire time.

62.   Moreover, the District's own website states that:

A student with an IEP that requires transportation to school will ride the bus from their home to school, even if he/she is non-remote. The student does not need to apply for subscription busing. The IEP must state in writing that the student is required to ride the bus to school.

63.   Although A.S.'s parents had no choice but to accept the offered transportation, the drop off and pick up location at the Municipal Building is not appropriate because Schooley's Mountain Road is a busy, steep, curved road with no sidewalk or shoulder on either side for pedestrians to safely traverse.

64.  It would be unsafe for A.S. to walk to and from the Municipal Building every school day morning and afternoon, particularly given her emotional and cognitive disabilities.

65.  As explained by her therapist, Sarah Amador, Ph.D.:

> Her most prominent symptoms include very rigid thinking patterns with limited ability to make cognitive shifts, poor ability to transition from one activity/location to another, dissociative episodes resulting in a disconnect from her current surroundings, refusal to comply to directives/commands in the home and school setting, impaired functioning in verbal and nonverbal interactions, negative/catastrophic thinking style including impaired emotional regulation and inability to sustain attention to tasks. Since last spring, it was determined by the IEP team that Abigail required a more therapeutic program and since September, she has been attending the Sage Day School.  With respect to transportation to and from school, Abigail resides on a very treacherous, mountainous street with no shoulder for a pedestrian to walk along.  With all things considered (physical danger of street, Abigail's tendency to dissociate, and increased need for therapeutic support), it is deemed necessary for Abigail's physical and emotional safety that transportation is provided door to door.

66.  While A.S.'s father was able to drop her off and pick her up at the Municipal Building from the time this transportation began, on October 11, 2021, through the end of the 2021-2022 school year, this was only because he was laid off in August from a full-time position he had as a Senior Program Associate at a philanthropic foundation for the last ten years.

67.   Because the family lives approximately 4.6 miles from
Central High School, if A.S. was not required by the District to
attend Sage during the 2021-2022 school year because of her
disabilities, she, like all other high school students who live
on Schooley's Mountain Road, would have received curb to curb
transportation under the District's own transportation policies.

68.   This would also have been required under New Jersey's
education laws and regulations that require school districts to
"provide transportation to public school students who reside
remote from their assigned school of attendance." N.J.S.A. 18A:
39-1; N.J.A.C. 6A:27-1.3 (a high school student is considered to
live remote from school if they live more than two and one-half
miles from school).

69.   Indeed, as already mentioned above, during his
freshman year, when A.S.'s brother attended Central High School,
he was picked up and dropped off in front of their home by a
full-sized yellow bus just like all other public high school
students who live on Schooley's Mountain Road.

70.   On October 5, 2021, A.S.'s parents filed on their own
a request for a due process hearing to challenge the Board's
refusal to provide "Curb to Curb" transportation as called for
by her April 23, 2021 IEP,  and to be reimbursed for
transporting A.S. to and from Sage from September 10 through
October 8, 2021.

71.   After that, on October 12, 2021, a "30 Day Review" IEP meeting was held to formalize A.S.'s placement at Sage.

72.   At that meeting, the Child Study Team proposed to change A.S.'s transportation from "Curb to Curb" as provided for in her April 23, 2021 IEP to transportation with the "pickup and drop-off location" at the Washington Township Municipal Building.

73.   Plaintiffs expressed their concerns in the IEP:

> Mr. and Mrs. [S] are extremely concerned with the pick-up and drop-off location of the Washington Township municipal building as there are no sidewalks and the road is extremely dangerous and heavily traveled. Should there be no one to drop off or pick up [A.S.] from the Washington Township municipal building, she would be unable to go to school.

74.   Although the Board did not provide a formal response in the notice of rights section of the IEP,  Mr. Deon did explain in an email that the District would not allow him to include curb to curb transportation on an IEP, regardless of the student's circumstances, unless the student had a physical disability. He wrote:

> Barring any physical disabilities, I am unable to put any type of curb-to-curb/home pickup in any student's IEP. I have included "at this time" in case anything were to change for the future. If that is indeed the case and I am given a different directive, I would be happy to amend accordingly. That being said, I have still outlined your concerns regarding this matter. If you would prefer, I could remove this comment section, though that would also not denote a curb-to-curb scenario, it would just specify that transportation is mandated. If you are able to reach a

different agreement with the transportation company, we can go from there as well.

75.   Even though, under IDEA's stay-put provision, the District was required to maintain A.S.'s then-current educational placement, which pursuant to her April 23, 2021 IEP includes curb to curb transportation, and could not implement the change proposed on October 12, 2021 without her parents' consent - since her due process petition was filed before then on October 5, 2021 - the District refused to implement or acknowledge responsibility for the curb to curb transportation called for in the April 23, 2021 IEP pending a due process hearing.

76.   On October 25, 2021, the parties engaged in mediation, but they were not able to resolve their dispute.

77.   On or about November 9, 2021, and through early December, the parties engaged in settlement discussions facilitated by an Administrative Law Judge ("ALJ"), but they were still unable to resolve their dispute.

78.   On January 5, 2022, the undersigned attorney filed on behalf of A.S. and her parents a motion for emergent relief to enforce stay-put seeking an order compelling the District to implement the curb to curb transportation in A.S.'s stay-put IEP.

79.  On January 14, 2022, the matter was assigned to another ALJ, Jude-Anthony Tiscornia, for a hearing on the stay-put motion.

80.  He scheduled oral argument on January 25, 2022.

81.  On January 25, 2022, ALJ Tiscornia held oral argument via Zoom, and, on January 26, 2022, he issued a Final Decision – Emergent Relief denying the parents' motion.

82.  Although he found that A.S.'s stay-put placement included curb to curb transportation, he concluded, without any factual basis, that "'curb to curb' suggests on its face that the pick-up occur at the nearest and safest curbside location," and furthermore, that, "in the present case," the nearest and safest curbside location "appears to be the municipal building a few hundred yards away from the petitioner's front door."[2]

83.  A plenary hearing on the merits of A.S.'s parents' request for a due process hearing, which regarded whether the District had failed to provide A.S. curb to curb transportation as required by her IEP, and whether it was appropriate for the District to remove curb to curb transportation from her IEP, was held over four days from June 1 through August 3, 2022.

---

[2] It is not clear to whose safety he refers. It would seem he is referring to the safety of the driver as he could not mean that it is safest for the student to walk to the Municipal Building based on the undisputed facts of this case.

84.  ALJ Tiscornia agreed that the District failed to abide
by A.S.'s IEP and provide transportation from September 10
through October 8, 2021, and ordered the District to compensate
them for mileage at the prevailing rate, but he did not identify
what that rate was.

85.  Although Plaintiffs requested $1,380.00 based on the
standard daily transportation reimbursement rate paid by the
District when it contracted with parents to transport children
with disabilities to out-of-district placements, the District
only paid them $513.24.

86.  As for A.S.'s claims regarding the rest of the school
year, ALJ Tiscornia decided that the District's failure to pick
up and drop off A.S. from in front of her home did not violate
A.S.'s right to FAPE because her parents were able to transport
her to and from the Municipal Building and, because, as he
previously concluded on the application for emergent relief,
contrary to the testimony of every witness who was familiar with
the use of the term "curb to curb transportation" on IEPs, and
based solely on his own idiosyncratic speculation, the term
actually "suggests on its face that the pickup occur at the
nearest and safest curbside location, which, in the present
case, appears to be the municipal building."

87.  Although both parties addressed the appropriateness of
the change proposed to the transportation in A.S.'s IEP on

October 12, 2021, ALJ Tiscornia chose not to address the issue of the appropriateness of the proposed change to A.S.'s IEP, since it was not addressed in the parent's request for a due process hearing, which they filed *pro se* on October 5, 2021, seven days before the change was proposed.

88.   This unfortunately will require the parents to file another due process hearing and present the same evidence all over again in order to have the issue regarding the appropriateness of the change in the IEP addressed unless this Court will address the issue.

89.   A.S.'s placement changed this 2022-2023 school year and she is now attending a new out-of-district placement, Cornerstone Day School in Cranford, New Jersey.

90.   Although the District has not added curb to curb transportation back to her IEP, it is picking her up and dropping her off in front of her home again using another vendor, R & May Transportation.

91.   Plaintiffs also filed, on February 1, 2022, with the Department of Education, a complaint against the District based on the same set of facts alleging that the District discriminated against A.S. by refusing to provide her curb to curb transportation solely because she is a person with a disability and because she is not a person with a physical or cognitive disability.

92.   That case was also assigned to ALJ Tiscornia, but he denied Plaintiffs' request to consolidate the two hearings.

93.   That matter was not heard until October 7, 2022, although the parties relied primarily upon the testimony adduced during the due process hearing.

94.   ALJ Tiscornia issued an Initial Decision on January 30, 2023, recommending the dismissal of the complaint.

95.   However, on April 24, 2023, the Commissioner of Education issued a Final Decision rejecting ALJ Tiscornia's Initial Decision and ordering the District to provide A.S. curb to curb transportation.

96.   The Commissioner did not reach Plaintiffs' discrimination claims finding it unnecessary to do so because "It is the Board's responsibility to provide A.S. with transportation under N.J.A.C. 6A:27-1.3(a) (because she lives remote or more than 2.5 miles from her assigned school), and her parents should not be burdened with the additional responsibility of driving her back and forth because the Board has chosen a location that is indisputably unsafe for her to traverse on her own."

97.   The Commissioner also concluded that the Board should provide A.S. curb to curb transportation: "Considering the specific circumstances in this matter – including the treacherous route A.S. would be required to walk to her assigned

bus stop and the fact that transportation vehicles have safely stopped at A.S.'s home in the past – the Commissioner finds that the Board should provide curb-to-curb transportation to and from A.S.'s out-of-district placement at Sage beginning in the 2023-24 school year."[3]

98.   To date, while the District has resumed curb to curb transportation for A.S., it has not added it back to her IEP.

### COUNT I
### IDEA - DENIAL OF FAPE, FAILURE TO IMPLEMENT IEP

99.   Plaintiffs incorporate by reference paragraphs 1-98, above, as if fully set forth herein.

100.   "To prevail on a claim that a school district failed to implement an IEP, a plaintiff must show that the school failed to implement substantial or significant provisions of the IEP, as opposed to a mere de minimis failure, such that the disabled child was denied a meaningful educational benefit." *Melissa S. v. Sch. Dist. of Pittsburgh,* 183 F. App'x 184, 187 (3d Cir. 2006) (citation omitted); *see also*, *Fisher ex rel. T.C. v. Stafford Twp. Bd. of Educ.*, 289 F. App'x 520, 524 (3d Cir. 2008)(same proposition).

101.   The District's failure to provide A.S. any transportation from September 10 through October 8, 2021

---

[3] On June 8, 2023, the Board filed an appeal of the Commissioner's Decision with the New Jersey Superior Court, Appellate Division.

constituted a failure to implement a substantial provision of the IEP that would have resulted in a complete denial of educational benefits if her parent had not been able to transport her to and from school and, therefore, the District's failure constituted a denial of FAPE.

102. Additionally, the District's failure to provide the curb to curb transportation in A.S.'s IEP from October 8, 2021, through the end of the 2021-2022 school year also constituted a failure to implement a substantial provision of the IEP that would have resulted in a complete denial of educational benefits if her parent had not been able to transport her to and from the Municipal Building and, therefore, this failure of the District also constituted a denial of FAPE.

103. Although ALJ Tiscornia found that the complete failure to provide transportation from September 10 through October 8, 2021, constituted a denial of FAPE, the relief he ordered failed to adequately compensate Plaintiffs for transporting A.S. to and from school during that time.

104. Additionally, ALJ Tiscornia erroneously concluded that the District's provision of transportation to and from the Municipal Building constituted curb to curb transportation and, therefore, that it did not constitute a denial of FAPE.

**WHEREFORE,** Plaintiffs demand judgment against the Board and the following relief:

A.  An order reversing the ALJ's decision denying
    Plaintiffs' claim that the District violated A.S.'s
    right to FAPE by failing to implement the curb to curb
    transportation in her IEP from October 8, 2021 through
    the end of the 2021-2022 school year;

B.  An order directing the Board to compensate Plaintiffs
    fairly and adequately for transporting A.S. to and
    from school from September 10 through October 8, 2021;

C.  An order directing the Board to fairly and adequately
    compensate Plaintiffs for transporting A.S. to and
    from the Municipal Building from October 11, 2021,
    through the end of the 2021-2022 school year;

D.  An award of reasonable attorney's fees and costs; and

E.  Such other relief as is just and proper.


**COUNT II**
**IDEA - DENIAL OF FAPE, INAPPROPRIATE IEP**

105.  Plaintiffs incorporate by reference paragraphs 1-104,
above, as if fully set forth herein.

106. Under IDEA, a school district must make FAPE available
to every child with a disability. 20 U.S.C. § 1412(a)(1).

107. FAPE means "special education" and "related services"
that are, among other things: "provided at public expense, under
public supervision and direction, and without charge," and
"provided in conformity with the [IEP]." 20 U.S.C. § 1401(9).

108. "Related services," including transportation, are
services "required to assist a child with a disability to
benefit from special education." 20 U.S.C. § 1401(26)(A).

109. By removing curb to curb transportation from A.S.'s
IEP on October 12, 2021, the District failed to offer the kind

of transportation she requires to be able to benefit from her special education program without her parents having to provide transportation to and from the Municipal Building and, therefore, denied her of FAPE.

110. ALJ Tiscornia erroneously failed to address this issue because, although the parties addressed it at the hearing, the parents did not raise the issue in their original *pro* se request for a hearing since it was filed seven days before the District actually removed curb to curb transportation from the IEP.

**WHEREFORE,** Plaintiffs demand judgment against the Board and the following relief:

A.    An order directing the Board to return curb to curb transportation to A.S.'s IEP;

B.    An order directing the Board to implement curb to curb transportation by picking up and dropping off A.S. in front of her home;

C.    An order directing the Board to fairly and adequately compensate Plaintiffs for transporting A.S. to and from the Municipal Building from October 11, 2021, through the end of the 2021-2022 school year;

D.    An award of reasonable attorney's fees and costs; and

E.    Such other relief as is just and proper.

## COUNT III
## IDEA - VIOLATION OF "STAY-PUT"

111. Plaintiffs incorporate by reference paragraphs 1-110, above, as if fully set forth herein.

112. Under IDEA, "during the pendency of any proceedings conducted pursuant to [IDEA], unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." 20 U.S.C. § 1415(j). This is known as "stay-put."

113. "[T]he dispositive factor in deciding a child's 'current educational placement' should be the [IEP] actually functioning when the 'stay put' is invoked." *Drinker v. Colonial Sch. Dist.*, 78 F.3d 859, 867 (3d Cir. 1996) (internal quotes and citations omitted). Generally, that is the child's last agreed upon IEP. *Id.* at 862, n. 3.

114. Pending a due process hearing, a school district may not unilaterally change one of the basic constituent elements of a student's IEP, including transportation, if the change "is likely to affect in some significant way the child's learning experience." *DeLeon v. Susquehanna Cmty. Sch. Dist.*, 747 F.2d 149, 153 (3d Cir. 1984).

115. Here, the Board's refusal to implement the curb to curb transportation in A.S.'s current IEP left her without transportation necessary for her to safely go to school and, therefore, violated her right to stay-put.

**WHEREFORE,** Plaintiffs demand judgment against the Board and the following relief:

A.    An order reversing the ALJ's decision denying
      Plaintiffs' claim that the District violated A.S.'s
      right to stay put from October 5, 2021 through the end
      of the 2021-2022 school year;

B.    An order directing the Board to fairly and adequately
      compensate Plaintiffs for transporting A.S. to and
      from the Municipal Building from October 11, 2021,
      through the end of the 2021-2022 school year;

C.    An award of reasonable attorney's fees and costs; and

D.    Such other relief as is just and proper.

**COUNT IV**
**SECTION 504 – DISCRIMINATION BASED ON DISABILITY**

116. Plaintiffs incorporate by reference paragraphs 1-115,
above, as if fully set forth herein.

117. Under Section 504 of the Rehabilitation Act of 1973
("Section 504"), "[n]o otherwise qualified individual with a
disability . . . shall, solely by reason of her or his
disability, be excluded from the participation in, be denied the
benefits of, or be subjected to discrimination under any program
or activity receiving Federal financial assistance." 29 U.S.C. §
794(a).

118. In order to establish a violation of Section 504, a
plaintiff must prove that (1) she is "disabled" as defined by
the Act; (2) she is "otherwise qualified" to participate in
school activities; (3) the school or the board of education
receives federal financial assistance; and (4) she was excluded
from participation in, denied the benefits of, or subject to

discrimination at, the school. *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999).

119. As the District has: a) denied A.S. door-to-door transportation that she would receive if she were a non-disabled student solely because she has a disability, and b) refused to consider whether she might require door-to-door transportation as a related service solely because she does not have a physical or cognitive disability, it has discriminated against A.S. in violation of Section 504.

**WHEREFORE,** Plaintiffs demand judgment against the Board and the following relief:

A. An order directing the Board to compensate Plaintiffs fairly and adequately for transporting A.S. to and from school from September 10 through October 8, 2021;

B. An order directing the Board to fairly and adequately compensate Plaintiffs for transporting A.S. to and from the Municipal Building from October 11, 2021, through the end of the 2021-2022 school year;

C. An award of reasonable attorney's fees and costs; and

D. Such other relief as is just and proper.

## COUNT V
## ADA – DISCRIMINATION BASED ON DISABILITY

120. Plaintiffs incorporate by reference paragraphs 1-119, above, as if fully set forth herein.

121. Under Title II of the Americans with Disabilities Act ("the ADA"), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in

or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

122. The same standards that govern a claim of discrimination under Section 504 govern a claim of discrimination under the ADA. *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 260 (3d Cir. 2013).

123. As the District has: a) denied A.S. door-to-door transportation that she would receive if she were a non-disabled student solely because she has a disability, and b) refused to consider whether she might require door-to-door transportation as a related service solely because she does not have a physical or cognitive disability, it has discriminated against A.S. in violation of the ADA.

**WHEREFORE,** Plaintiffs demand judgment against the Board and the following relief:

A.   An order directing the Board to compensate Plaintiffs fairly and adequately for transporting A.S. to and from school from September 10 through October 8, 2021;

B.   An order directing the Board to fairly and adequately compensate Plaintiffs for transporting A.S. to and from the Municipal Building from October 11, 2021, through the end of the 2021-2022 school year;

C.   An award of reasonable attorney's fees and costs; and

D.   Such other relief as is just and proper.

### COUNT VI
### NEW JERSEY LAW AGAINST DISCRIMINATION – DISCRIMINATION BASED ON DISABILITY

124. The New Jersey Law Against Discrimination ("LAD") guarantees that, "All persons shall have the opportunity to . . . obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . disability . . . ." N.J.S.A. 10:5-4.

125. Under the LAD, a person may establish a claim of disability-based discrimination by showing "that he or she (1) had a disability; (2) was otherwise qualified to participate in the activity or program at issue; and (3) was denied the benefits of the program or otherwise discriminated against because of his or her disability." *Wojtkowiak v. New Jersey Motor Vehicle Comm'n*, 439 N.J. Super. 1, 14, 106 A.3d 519, 527 (App. Div. 2015).

126. As the District has: a) denied A.S. door-to-door transportation that she would receive if she were a non-disabled student solely because she has a disability, and b) refused to consider whether she might require door-to-door transportation as a related service solely because she does not have a physical disability, it has discriminated against A.S. in violation of the LAD.

**WHEREFORE,** Plaintiffs demand judgment against the Board and the following relief:

A.    An order directing the Board to compensate Plaintiffs fairly and adequately for transporting A.S. to and from school from September 10 through October 8, 2021;

B.    An order directing the Board to fairly and adequately compensate Plaintiffs for transporting A.S. to and from the Municipal Building from October 11, 2021, through the end of the 2021-2022 school year;

C.    An award of reasonable attorney's fees and costs; and

D.    Such other relief as is just and proper.


Dated: June 14, 2023

_____
Attorney for Plaintiffs