**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| J.S. and S.S. o/b/o A.S., | |
| Plaintiffs, | |
| v. | No. 22cv561 (EP) (LDW) |
| | **OPINION** |
| WEST MORRIS REGIONAL HIGH SCHOOL BOARD OF EDUCATION, | |
| Defendant. | |

**PADIN**, **District Judge.**

Plaintiffs J.S. and S.S. (the "Parents"), on behalf of their child A.S. (the "Child"), a special education student, ask the Court to compel the West Morris Regional High School Board of Education (the "Board") to provide curb-to-curb transportation from their home to the Child's school as part of the Child's individualized education program ("IEP"). The Board believes—and an administrative law judge ("ALJ") agreed—that the Board satisfied its obligation to provide the Child a free appropriate public education ("FAPE") by providing transportation to school from a municipal building located 1/3 mile down a treacherous mountain road.

The parties now move for summary judgment. Because the Board's failure to provide home-to-school transportation violated the Child's right to a FAPE, the Court will **GRANT** *in part* the Parents' application, **REVERSE** the ALJ's determination and award appropriate monetary and injunctive relief as detailed below, and **GRANT** *in part* the Board's application to the extent of dismissing Plaintiff's discrimination claims.

## I.     BACKGROUND

### A.     The Parties

The Parents, together with the Child and her older brother (the "Brother"), have lived on Schooley's Mountain Road ("Home") in Long Valley, New Jersey, an unincorporated community within Morris County's Washington Township ("Washington"), for over fifteen years. Pls. Facts ¶¶ 1, 5, 10.[1] The Board operates the West Morris Regional High School District (the "District"), which serves high school-aged students in western Morris County. *Id.* ¶¶ 6-9. The District comprises two high schools: West Morris Central High School ("Central HS"), and West Morris Mendham High School ("Mendham HS"). *Id.* ¶ 12.

### B.     Elementary and Middle School

Washington Township's elementary-aged public school students are served by the Washington Township School District (the "Washington District"). *Id.* ¶ 10. In 2007, the Brother started kindergarten at Benedict A. Cucinella Elementary School ("Elementary"), about four miles from Home. *Id.* ¶¶ 14-15. Four years later, the Child also enrolled there in kindergarten. *Id.* ¶ 16. Both children attended Elementary through the end of their fifth grade years. *Id.* ¶ 17.

After that, each attended Long Valley Middle School ("Middle"), about a mile from Home. *Id.* ¶¶ 18-19. The Child attended only until eighth grade in September 2020, when she was placed

---

[1] These facts are drawn from the Parents' Statement of Material Facts Not in Dispute. D.E. 29-3 ("Pls. Facts"). As the Parents highlight, the Board's failure to submit a responsive statement of material facts, addressing each paragraph of the Parents' Facts, means that they are "deemed undisputed" for summary judgment purposes. L.Civ.R. 56.1(a). Moreover, what the Board *does* submit—a statement of material facts signed by counsel—fails to "cit[e] to the affidavits and other documents submitted in support of the motion." *Id.* The Court notes, in any event, that the only material facts in dispute—precisely what transpired regarding the July 2021 IEP meeting and resulting IEP removing curb-to-curb transportation—are ultimately immaterial to this Court's determination: that the failure to provide curb-to-curb transportation from the Home violated the Child's right to a FAPE.

out-of-district at Newmark School in Scotch Plains, New Jersey ("Newmark") pursuant to her IEP. *Id.* ¶ 20. Thus, from September 2007 through June of 2020—the last year that the Child attended school in Washington, a Washington large yellow school bus picked the Brother and Child up, and dropped them off, in front of their home. *Id.* ¶¶ 21-22.

After middle school, most public high school students who live near the Home are assigned to Central High, but some attend Mendham High. *Id.* ¶ 13. During the 2016-2017 school year, the Brother attended Central High for his freshman year. *Id.* ¶ 23. As before, a large yellow school bus picked him up and dropped him off in front of the Home. *Id.* ¶ 24. Beginning in September 2017, at the start of the Brother's sophomore year and pursuant to his IEP, the District placed him at Newmark. *Id.* ¶ 25. The Brother continued to receive, as his IEP mandated, "curb-to-curb" transportation, *i.e.*, drop-off and pick-up at home. *Id.* ¶ 26.

### C.    The Child's IEP

The Child has been diagnosed with Major Depressive Disorder, Attention Deficit Hyperactivity Disorder, Dysgraphia, Nonverbal Learning Disorder, and Unspecified Neurodevelopmental Disorder. *Id.* ¶ 30. Based on those diagnoses, the Child is eligible for "special education and related services." *Id.* ¶ 29.

The Child's original classification dates from December 15, 2014, when she was seven years old and in second grade. *Id.* ¶ 31. From initial classification in 2014 through June 2020, the Child's IEP called for resource program in-class support, counseling, and a 1:1 aide; in middle school, she also received pull-out support in math. *Id.* ¶ 32. Her IEP did not include transportation; like her Brother, and other public elementary school students near the Home, the Child already received Washington busing. *Id.* ¶ 33.

In June 2020, at the age of thirteen and at the end of seventh grade, the Child was placed at Newmark School.  *Id.* ¶ 34.  Transportation was added as a related service to the Child's IEP, which indicated "curb to curb" transportation.  *Id.* ¶ 35.  The Parents and others, including the Child's case managers, understood this to mean, in substance, "the curb of [the Home] to the curb of the school."  *Id.* ¶¶ 35-38.

### D.    The Child Receives Out-of-District Transportation

The Washington District provides transportation for students with disabilities placed out-of-district through the Morris County Educational Services Commission or the Sussex County Regional Cooperative.  *Id.* ¶ 41.  Beginning in September 2020, the Washington District provided transportation for the Child to Newmark via a full-sized yellow bus provided by Prestige, a private vendor.  *Id.* ¶¶ 39-41.

On January 14, 2021, the Child's out-of-district placement changed to Barnstable Academy in Oakland, New Jersey ("Barnstable").  *Id.* ¶ 42.  She continued to receive "curb-to-curb" transportation using a van.  *Id.* ¶¶ 43-44.

On April 23, 2021, the Washington District convened a "Transition IEP meeting" to plan the Child's high school education.  *Id.* ¶ 45.  Joseph Schweigart, then the Child's case manager, led the meeting and Steven Deon, Central High's Child Study Team case manager, participated. *Id.* ¶ 46.

Because Barnstable concluded that the Child required a more therapeutic placement, her April 23, 2021 IEP called for a private, out-of-district therapeutic day school for ninth grade.  *Id.* ¶ 47.  The IEP continued "curb-to-curb" transportation, which J.S. continued to interpret as "from [the Home] to the school door and back."  *Id.* ¶¶ 49, 50.

**E.      The July 14, 2021 IEP Meeting Regarding High School Placement**

On July 1, 2021, the District assumed responsibility for the Child's IEP.  *Id.* ¶ 53.  J.S. ultimately chose Cornerstone Day School ("Cornerstone") and consented to send the Child's records there for consideration.  *Id.* ¶¶ 51, 52.  However, the Parents and the Child's private therapist believed she required programming to address her social and emotional needs during the summer and pending a new placement, and the Parents wanted a back-up plan.  The Parents requested an IEP team meeting to discuss summer placement, and potential fallback placement, at Central HS.  *Id.* ¶ 54.

Deon convened an IEP team meeting on July 14, 2021.  *Id.* ¶ 55.[2]  The District denied the Parents' request for an interim placement, and advised them that attendance at Central HS was not an option.  *Id.* ¶ 56.  Deon told the Parents that, if the Child was not placed in a new school in time for the new school year, she would receive home instruction.  *Id.* ¶ 57.  Transportation was not discussed at that time.  *Id.* ¶ 58.  Plaintiffs did not receive any draft IEP before or after the meeting. *Id.* ¶ 59.

Because the Child did not like Cornerstone, the Parents and Deon agreed to send the Child's records to Sage Day High School in Boonton, New Jersey ("Sage").  *Id.* ¶ 60.  Deon sent the records, Sage accepted the Child, and all agreed that the Child would attend Sage for ninth grade. *Id.* ¶ 61.  Although Sage's school year began August 25, 2021, the Child did not begin until

---

[2] Other than the existence of the July 14, 2021 IEP meeting, the parties dispute nearly everything else about it.  This includes whether, during the meeting, the Child was temporarily placed on home instruction—the reason, according to the District, that transportation was removed from the Child's IEP—and whether Plaintiffs received written notice of the new IEP removing transportation.  *Compare* Board Facts ¶ 13 *with* Pls. Resp. Facts ¶ 13.  As noted above, none of the Board's facts are supported with any citations to the record.  But again, even if the Board's facts are accurate, they are immaterial to this matter's central question: whether the Board's failure to provide transportation between the Home and Sage denied the Child a FAPE.

September 10, 2021; the Child was not offered, and did not receive, home instruction before she began at Sage. *Id.* ¶¶ 62-63.

**F.    The Transportation Issues**

On September 8, 2021, Deon advised J.S. that the Child Study Team had reached out to the District's Transportation Department. *Id.* ¶ 64. As of September 9, 2021—the day before the Child was to begin at Sage—Deon had "received no confirmation regarding transportation" and advised that driving the Child "would be the best option at this time." *Id.* ¶¶ 65-66.

The Child started at Sage the next day, September 10, 2021. *Id.* ¶ 67. But without transportation available, the Parents had to transport the Child to and from Sage until October 7, 2021, when the District secured transportation between the Washington Township Municipal Building (the "Municipal Building"), about 1/3 of a mile down the hill from the Home, and Sage. *Id.* ¶¶ 67-68. The drive to and from Sage amounted to about three to four hours per day. *Id.* ¶ 68. A.S. was only able to transport the Child because he had lost his job on August 31, 2021; J.S. was not available for transport due to her work hours. *Id.* ¶¶ 69-70.

The Parents received inconsistent explanations for the delay in providing transportation. On September 20, 2021, Michael Reinknecht, the District's Director of Special Education, told J.S. that the "district transportation coordinator [Nancy Genuardi] would, and will, provide transportation were a single vendor or in-district resource available, but despite Mrs. Genuardi's efforts, no vendors have bid on the route." *Id.* ¶ 73; D.E. 31-2 at 63.

But two days later, Reinknecht argued that "the District is not responsible to transport [the Child]" to Sage because the July 14, 2021 IEP—the one the Parents claim not to have seen or

6

approved—stated, "Transportation is not required."  Pls. Facts ¶ 74; D.E. 31-2 at 68.[3]  However, the District would "continue[] to try to identify a vendor to . . . pick [the Child] up at" Home and offered "courtesy transportation" between the Municipal Building, about 1/3 mile from the Child's home, and Sage.  Pls. Facts ¶ 76.

Then, on September 23, 2021, Reinknecht indicated a safety concern about pickup from the Home.  Reinknecht stated that, "[s]hould the IEP team determine that transportation is a required related service for [the Child], the [D]istrict's recommendation would be that all current future pick-up and drop-off be from the Municipal Building, a mere tenth of a mile down the road, as it assures [the Child's] safety."  *Id.* ¶ 77; D.E. 31-2 at 71.

Ultimately, the District secured the same vendor that previously transported the Brother: Cassidy Transportation ("Cassidy").  Pls. Facts ¶ 80.  However, though they had previously done so for the Brother, Cassidy's owner refused to permit the driver to pick up and drop off the Child in front of the Home.  *Id.* ¶ 81.  Thus, the District agreed only to pick up and drop off the Child from the Municipal Building.  *Id.* ¶ 82.

All parties agree that the walk between the Home and the Municipal Building would be treacherous, particularly for the Child.  To walk between them, the Child would have to traverse a "busy, dangerous, steep mountain road which, below [the Home], has a blind curve and at points no sidewalks or shoulder and, for walkers, poor visibility."  *Id.* ¶ 83.  The Child's longtime therapist also asserts that her psychological disabilities would present their own hazard.  *Id.* ¶ 84.

---

[3] Reinknecht explained that the IEP "went into effect on the 16th day following the [July 14] IEP meeting" because the Parents had not filed to block its implementation.  D.E. 31-2 at 71; Pls. Facts ¶ 75.

## G.    The Due Process Matter

On October 5, 2021, the Parents requested a due process hearing with the New Jersey Department of Education, Office of Special Education Policy and Dispute Resolution.  *Id.* ¶ 86 (the "Due Process Matter" or "Hearing").  The Parents challenged the Board's refusal to provide "curb to curb" transportation as provided for in the Child's prior, April 23, 2021 IEP, and for reimbursement for transporting the Child to and from Sage.  *Id.*

On October 12, 2021, the Board convened a "30 Day Review" IEP meeting to formalize the Child's placement at Sage.  *Id.* ¶ 89.  At that meeting, Deon proposed to change the Child's transportation from "curb to curb," as in the April 23, 2021 IEP, to transportation with pick-up and drop-off at the Municipal Building.  *Id.* ¶ 90.  The Parents objected, arguing that the Child would be unable to attend school if either Parent could not drop her off at the Municipal Building.  *Id.* ¶ 91.  In a subsequent email exchange, Deon indicated that the Board would not permit curb-to-curb transportation in the Child's IEP unless the Child had a physical disability requiring it.  *Id.* ¶ 92.

After mediation did not resolve the dispute, Plaintiffs retained counsel and filed an administrative motion for emergent relief compelling the Board to provide curb-to-curb transportation.  *Id.* ¶ 98.  On January 26, 2022, ALJ Jude-Anthony Tiscornia denied Plaintiff's motion.  *Id.* ¶ 100.  Although ALJ Tiscornia found that the Child's stay-put placement included curb-to-curb transportation, he found that "'curb to curb' suggests on its face that the pick-up occur at the nearest and safest curbside location"—here, the Municipal Building.  *Id.* ¶ 101.

The Parents appealed Judge Tiscornia's decision by filing an Order to Show Cause before this Court.  D.E.s 1-1, 1-4.  The Parents subsequently withdrew the application after the Board

voluntarily resumed curb-to-curb transportation after the end of the 2021-2022 school year. Pls. Facts ¶ 102.[4]

A plenary administrative hearing on the merits of Plaintiffs' due process request was held on June 1, 3, and 22, and August 3, 2022. *Id.* ¶ 103. As relevant here, multiple witnesses testified that most students for whom Washington Township provides transportation are picked up in front of their homes. *Id.* ¶¶ 114-15, 125. Indeed, had the Child not attended Sage, she would have been one of them. *Id.* ¶ 115. Instead, the Child was the only student on Schooleys Mountain Road who received transportation between the Municipal Building and school rather than home and school. *Id.* ¶ 127.

The Parents learned that, in some situations, parents can contract to transport their children to school and receive $69 per day from the District. *Id.* ¶¶ 128-29. Based on that rate, Plaintiffs sought $1,380 for the twenty days between September 10 and October 7, 2021 when J.S. transported the Child to and from Sage. *Id.* ¶ 130. Plaintiffs also sought $5,560 for the period between October 8, 2021, and June 3, 2022, when J.S. had to drive the Child to and from the Municipal Building every day, representing the approximate cost ($10) per trip to the Municipal Building, times four trips per day, times 139 days of attendance. *Id.* ¶¶ 131-33.

### H.    ALJ Tiscornia's Final Due Process Decision

ALJ Tiscornia issued a Final Decision on December 7, 2022. D.E. 30-2 (the "Final Due Process Decision"). ALJ Tiscornia agreed that the District failed to abide by the Child's IEP and

---

[4] On March 3, 2022, Petitioners were informed that, for reasons that are not immediately clear but appear to relate to a misinterpretation of the correct IEP, the District had instructed Sage to "cease clinical services." *See* D.E. 30-6 at 4. On March 16, 2022, the Parents filed a second request for emergency relief, this time seeking resumption of therapeutic services at Sage. D.E. 30-6. A different ALJ granted the request.

provide transportation between September 10 and October 7, 2021, and ordered the Board to compensate Plaintiffs only for mileage at the prevailing rate. *See id.* at 19, 21.[5]

ALJ Tiscornia also found that the District's failure to pick up and drop off the Child at Home did not violate the Child's right to a FAPE because the IEP's use of "curb-to-curb . . . suggests on its face that the pickup occur at the nearest and safest curbside location, which, in the present case, appears to be the [M]unicipal [B]uilding." *Id.* at 19-21. ALJ Tiscornia did not address the appropriateness of the proposed change to the Child's transportation in the October 12, 2021 IEP because that IEP was raised *after* the parent's October 5, 2021 request for a due process hearing. *Id.* at 17. The Parents appealed the Final Due Process Decision to this Court. D.E. 1.[6]

## I.    ALJ Tiscornia Finds No Discrimination and the Commissioner Reverses

For the 2022-23 school year, the Child's placement changed to Cornerstone Day School in Cranford, New Jersey. *Id.* ¶ 140. Although the District did not add curb-to-curb transportation back to the Child's IEP, a new transportation vendor resumed pick ups and drop offs at the Home. *Id.* ¶ 141.

On February 1, 2022, Plaintiffs filed a separate Complaint against the Board with the Department of Education, Office of Controversies and Disputes. *Id.* ¶ 142 (the "Discrimination Complaint"). The Discrimination Complaint alleged that the Board discriminated against the Child by refusing to provide her curb-to-curb transportation solely because she is a person with a disability, but not a person with a physical disability. *Id.*

The Discrimination Complaint was also assigned to ALJ Tiscornia, who declined to consolidate the two hearings. *Id.* ¶¶ 143-44. It was not heard until October 7, 2022; ALJ Tiscornia

---

[5] The District paid $513.24 of the $1,380.00 Plaintiffs sought. Pls. Facts ¶ 136. How this was calculated is unclear.
[6] The Parents later filed an Amended Complaint. D.E. 25.

allowed the parties to rely primarily on the testimony and exhibits submitted during the Due Process Hearing, with some additional evidence. *Id.* ¶¶ 145-47.

On January 30, 2023, ALJ Tiscornia's Initial Decision recommended dismissal. D.E. 30-4 ("Initial Discrim. Dec."). On April 24, 2023, however, the Commissioner of Education's ("Commissioner") Final Decision rejected the Initial Decision. D.E. 30-3 ("Final Discrim. Dec.").[7] The Commissioner could not "reconcile why the Board would accept Cassidy's representation that the road is so unsafe that a vehicle cannot safely pick up a student (especially when other buses have previously stopped in front of her house), but at the same time find it acceptable for a student to walk down the same hazardous road, without a shoulder or sidewalks, to reach her assigned bus stop." Final Discrim. Dec. at 4. Thus, because "[i]t is the Board's responsibility to provide [the Child] with transportation under N.J.A.C. 6A:27-1.3(a)," and because the Parents "should not be required" to transport the Child to the Municipal Building to utilize that transportation, the Commissioner ordered the District to provide the Child curb-to-curb transportation from the Home. *Id.* at 5.[8]

The District appealed the Commissioner's Final Discrimination Decision to the Superior Court of New Jersey, Appellate Division, where it remains pending. *Id.* ¶ 152.

---

[7] Though ALJ Tiscornia declined to consolidate the Due Process and Discrimination Complaints, the parties nevertheless agreed that the record in the Due Process matter duplicated the Discrimination record. *See* D.E. 30-3 at 1 n.1.

[8] The Commissioner held that "[u]pon review, the Commissioner finds that the Board is not meeting its responsibility to provide A.S. with appropriate transportation to and from school." The basis for this holding, and reinstating the curb-to-curb transportation requirement from the Home is not immediately clear—in other words, whether the Commissioner found that the Board had discriminated against the Child. This is further clouded by the Commissioner's reliance on the Due Process record.

**J.**     **The Pending Summary Judgment Motions**

Plaintiffs now move for summary judgment. *See* Mot. The Board cross-moves for summary judgment. *See* Cross-Motion. Plaintiffs reply. D.E. 38 ("Reply").

Plaintiffs' summary judgment motion asks the Court to: (1) reverse ALJ Tiscornia's denial of Plaintiffs' claim that the Board denied the Child a FAPE when it removed "curb-to-curb" transportation from her IEP; (2) reverse ALJ Tiscornia's decision that the Board did not violate the Child's right to "stay-put"—that is, adhere to the April 23, 2021 IEP's curb-to-curb transportation requirement to and from the Home—during the pendency of the Due Process Hearing; and (3) find that the Board discriminated against the Child based on her psychological disability in violation of section 503 of the Rehabilitation Act, Title II of the Americans with Disabilities Act, and New Jersey's Law Against Discrimination. *See* Mot. Plaintiffs seek: (1) an award "to sufficiently compensate them" for the 20 days driving the Child to Sage until the Board provided transportation to and from the Municipal Building, and for driving the Child to and from the Municipal Building for the rest of the school year; and (2) injunctive relief ordering the District to return curb-to-curb transportation to the Child's IEP and barring future discrimination—in other words, continue transportation to and from the Home for as long as the Child needs it.

In opposition, the Board makes two arguments: the first, which comprises nearly the entire Cross-Motion, is that the failure to provide transportation to and from the Home did not violate the Child's right to a FAPE. *See* Opp'n at 20-28. And the second, confined to a brief footnote, is that Plaintiffs' discrimination claims, dismissed by ALJ Tiscornia in his January 30, 2023 decision, are not ripe for review because an appeal of that dismissal is currently before the New Jersey Superior Court, Appellate Division.

## II.    LEGAL STANDARDS

### A.    The IDEA Generally

The IDEA is a "comprehensive scheme of federal legislation designed to meet the special educational needs of children with disabilities." *M.A. ex rel E.S. v. State-Operated Sch. Dist.*, 344 F.3d 335, 338 (3d Cir. 2003). In exchange for federal funding, states must comply with certain substantive and procedural conditions in providing educational services to qualifying disabled students. *See T.R. v. Sch. Dist. of Philadelphia*, 4 F.4th 179, 182–83 (3d Cir. 2021). States apportion federal funds to Local Educational Agencies ("LEAs"), like the Board, who in turn provide educational services under the IDEA. *See* 20 U.S.C. §§ 1401(19), 1412–1414.

#### 1.    *Free Appropriate Public Education ("FAPE")*

One of the essential concepts of the IDEA is its mandate that qualifying students be provided with a FAPE. *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (citing 20 U.S.C. § 1412(a)(1)). Though the IDEA does not specifically prescribe what a FAPE entails, it does make clear that it consists of both "special education" and "related services." *See Bd. Of Educ. Of Henrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 188–89 (1982) (citing 20 U.S.C. §§ 1401(26), (29)).

#### 2.    *Individualized Education Program ("IEP")*

The IDEA's "centerpiece" is the "individualized education program" ("IEP"), which serves as the "primary vehicle" by which states provide students with a FAPE. *Honig v. Doe*, 484 U.S. 305, 311 (1988); *see also* 20 U.S.C. § 1412(a)(4). "An IEP is a written statement, 'developed, reviewed, and revised' by [an] 'IEP Team'—a group of school officials and the parents of the student—that spells out how a school will meet an individual disabled student's educational needs." *Y.B. ex rel. S.B. v. Howell Twp. Bd. of Educ.*, 4 F.4th 196, 198 (3d Cir. 2021) (quoting 20

U.S.C. §§ 1414(d)(1)(A), (B)).  In addition, an IEP sets forth the student's "present levels of academic achievement, offers measurable annual goals to enable the child to . . . make progress in the general educational curriculum, and describes supplementary aids and services . . . provided to the child to meet those goals." *Id.* (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(I), (II)(aa), (IV)) (cleaned up) (omissions in original).

There are two species of IDEA violations.  The first is a "substantive violation": when an "IEP's content, such as the educational services, is insufficient to afford the student a FAPE." *S.W. v. Elizabeth Bd. of Educ.*, No. 22-11510, 2022 WL 807344, at *6 (D.N.J. Mar. 17, 2022).  In contrast, a "procedural violation" occurs "when the school district fails to comply with the processes required by the IDEA." *Id.*; *see also ASAH v. New Jersey Dep't of Educ.*, No. 16-3935, 2017 WL 2829648, at *10 n.10 (D.N.J. June 30, 2017) ("A procedural violation generally concerns the process by which the IEP and placement offer was developed and conveyed; on the other hand, a substantive violation arises from a deficiency in the programming being offered." (cleaned up)).

The potential relief depends on the type of violation.  A substantive violation—such as a denial of a FAPE—may seek compensatory relief in the form of appropriate educational services within the district ("compensatory education") or tuition reimbursement for an appropriate placement in private school.  *See C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66 (3d Cir. 2010). "On the other hand, a plaintiff alleging only that a school district has failed to comply with a procedural requirement of the IDEA, independent of any resulting deprivation of a FAPE, may only seek injunctive relief for prospective compliance." *Id.*

## B.    Standard for Review of ALJ Decisions

The standard of review in an administrative appeal under the IDEA differs from the standard of review governing a typical summary judgment motion.  *See M.A. ex rel. G.A. v.*

*Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 F. App'x 404 (3d Cir. 2003). "When deciding an IDEA case, the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006).

"Under this standard, 'factual findings from the administrative proceedings are to be considered prima facie correct,' and 'if a reviewing court fails to adhere to them, it is obliged to explain why.'" *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (quoting *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 271 (3d Cir. 2003)). "In addition, if a[n ALJ] has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight." *Id.* (citation omitted). In other words, "a District Court must accept the [ALJ]'s credibility determinations 'unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.'" *Id.* (citation omitted). "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley*, 680 F.3d at 270. "Applying these standards, the district court may make findings 'based on the preponderance of the evidence[.]'" *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1064 (D.N.J. 2011) (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010)).

## III.    ANALYSIS

### A.    The Board's Failure to Provide Curb-to-Curb Transportation from the Home Substantively Violated IDEA by Failing to Provide a Related Service Necessary for the Child to Access a FAPE

This matter can be distilled to a single question: absent transportation between the Home and Sage, could the Child access a FAPE? The answer is no.

The Board argues that the Parents have "failed to proffer any evidence or testimony establishing that 'door-to-door' transportation was necessary to confer an educational benefit upon A.S." Opp'n at 26. Specifically, the Board focuses on the lack of any testimony from the Child's psychiatrist, or any other evidence demonstrating any physical or cognitive limitation preventing the child from using the Municipal Building bus stop. *Id.* This argument is a red herring; though a disability is sometimes the reason for *both* an educational accommodation (like a specialized school) *and* a related service (like busing to that school), that is not always the case.[9]

Sometimes, a child's physical disability necessitates specialized transportation. For example, in *Anchorage School District v. N.S.*, the student "depend[ed] on a wheelchair for mobility, [was] legally blind, ha[d] a seizure disorder, and suffer[ed] cognitive impairments"; his IEP provided transportation from "curb to curb," but his guardians sought a prescription for transportation from "door to door." No. 06-cv-264, 2007 WL 8058163, at *2 (D. Alaska Nov. 8, 2007). Because the student could not get himself from his door to the curb or from the curb to the door of the school, the IEP was required to include door-to-door service. *See id.* at *2, 7. Without that service, the student "[could not] benefit from his special education" because "he [could not] otherwise get to school." *Id.* at *8; *see also District of Columbia v. Ramirez*, 377 F. Supp. 2d 63, 65 (D.D.C. 2005) (holding that IEP should include aide to assist wheelchair-bound student because the student's parents "could not get him outside to the bus," thereby denying student FAPE); *Oconee Cnty. Sch. Dist. v. A.B., ex rel. L.B.*, No. 3:14-CV-72, 2015 WL 4041297, at *8 (M.D. Ga. July 1, 2015) (affirming ALJ's finding that district substantively violated the IDEA and denied student a FAPE by failing to provide a nurse on the child's bus who could administer Diastat for

---

[9] For that reason, this Court's disagreement with ALJ Tiscornia is not factual, but legal. This Court relies primarily upon the material fact upon which the parties agree: the road between the Home and the Municipal Building is not readily traversable by *any* child.

the child's seizures, which had to be administered within five minutes of the seizure, and affirming remedy of driving expenses until district provides Diastat-trained aide).

But the disability or limitation underlying the IEP does not *have* to be the reason that the transportation is required; indeed, the IDEA designates transportation a "*related* service . . . designed to enable a child with a disability to receive a free appropriate public education." 20 U.S.C.A. § 1401(26). The IDEA "requires transportation if that service is necessary for a disabled child 'to benefit from special education,' even if that child has no ambulatory impairment that directly *causes* a 'unique need' for some form of specialized transport." *Donald B. By & Through Christine B. v. Bd. of Sch. Comm'rs of Mobile Cnty., Ala.*, 117 F.3d 1371, 1373 (11th Cir. 1997) (quoting 20 U.S.C. § 1401(a)(17)). "[T]ransportation may be "necessary" . . . if in its absence a disabled child in private school would be denied "a genuine opportunity for equitable participation in [a special education program]," 34 C.F.R. § 76.651(a)(1), or special education program benefits "comparable in quality, scope, and opportunity for participation ... [to those provided for] students enrolled in public schools," 34 C.F.R. § 76.654(a). *Donald B.*, 117 F.3d at 1374.

It is true, as the Board highlights, that numerous courts, including this one, have found that the failure to provide door-to-door transportation did not deny the right to a FAPE. But in those cases, the child could walk to the bus stop—in other words, the failure to provide the "related service" (door-to-door transportation) did not prevent the child from accessing a FAPE. The issue was really parental convenience. *See, e.g.*, *S.W. v. Elizabeth Bd. of Educ.*, No. 21cv11510, 2022 WL 807344, at *3 (D.N.J. Mar. 17, 2022) (district did not deny child a FAPE when it switched from door-to-door transportation and student had to wait at the corner of his dead-end street, about eight houses away from his home); *MB v. City Sch. Dist. of New Rochelle*, No. 17-CV-1273, 2018 WL 1609266, at *16 (S.D.N.Y. Mar. 29, 2018) (even where door-to-door transportation was

previously provided, where child "was required to walk a short distance from his house to reach the provided transportation"; the failure to provide door-to-door transportation was not "so substantial or material as to constitute the denial of a FAPE"); *Donald B.*, 117 F.3d at 1374 (finding that petitioner, a six-year old child, had not demonstrated that he had been denied a FAPE where he had not offered evidence that he could not safely traverse three blocks to attend speech therapy without the board's help).

The situation here is different: the Child needed a bus to get to Sage,[10] and could not get there without traversing a dangerous mountain road. *See Anchorage Sch. Dist. v. N.S. ex rel. R.P.*, No. 3:06-CV-264, 2007 WL 8058163, at *8 (D. Alaska Nov. 8, 2007) ("[T]here is no question that [the child] cannot benefit from his special education if he is not transported to and from school, because, regardless of the cause, the plain fact is that he cannot otherwise get to school."). Here, there is no nearby, walkable, safe bus stop available in *any* direction, necessitating door-to-door transportation for the Child to receive a FAPE.

Even accepting the Board's position that door-to-door transportation to the Home was too dangerous—already a dubious proposition based on the fact that it occurred both before and since—that does not obviate the Board's obligation to provide the Child a FAPE. *See id.* at *9 (finding that, even accepting that district employee could have been inured using ramp at child's home, the service nevertheless would have to be provided in order to ensure a FAPE). The Board

---

[10] J.S.'s uncontroverted testimony indicates that the Child *was* capable of waiting by herself at the Home for pickup. *See* D.E. 30-10 (Transcript of June 1, 2022 hearing) at 71:1-19. In other words, had the Board provided transportation from the Home, the Parents would not have had to wait with or supervise the Child's transportation. But because the Board only provided pickup and drop-off at the Municipal Building, and because the parties agree that the Child could not safely walk there from Home, the Parents were *required* to drive the Child to the Municipal Building (and before that was available, directly to Sage), in order to guarantee the Child a FAPE. Without the Parents' transportation, the Child would have been denied a FAPE.

must "*complete* the transportation transaction"—here, getting the Child to and from the Home's driveway. *Id.* at *8. And because the Parents provided what the Board should have, the Parents must be reimbursed accordingly. *See id.* at *9 ("While it is true the guardians could hire somebody to push [the child] home from the curb every day, this consideration is not persuasive. Financial considerations aside, a disabled child's parents *always could* hire somebody to complete the *entire* transportation transaction."). The Court will discuss the appropriate remedy below.[11]

### B.    The Court Will Dismiss the Discrimination Claims Because They Remain Pending Before the Appellate Division

The Parents also argue that the Board violated various federal and state anti-discrimination laws when it denied curb-to-curb transportation. *See* Mot. at 30-35. In a brief footnote, the Board argues that the Court should not pass judgment on the discrimination issues because the Board's appeal of the Commissioner's Final Discrimination Decision remains pending before the Appellate Division. Opp'n at 2 n.1. The Court agrees with the Board.

There is a "'a strong federal policy against federal court interference with pending state judicial proceedings absent extraordinary circumstances.'" *Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 304 (3d Cir. 2004) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Assoc.*, 457 U.S. 423, 431 (1982); *see also Younger v. Harris*, 401 U.S. 37, 43 ("Since the beginning of this country's history Congress has, subject to few exceptions, manifested a desire to permit state courts to try state cases free from interference by federal courts.")). *Younger* abstention "is appropriate when: (1) there is a pending state judicial proceeding; (2) the proceeding

---

[11] Based on this holding, the Court need not address Plaintiff's "stay-put" argument and claim, which rest on disputed issues of fact regarding the timing, receipt, and procedure surrounding certain IEPs.

implicates important state interests; and (3) the state proceeding affords an adequate opportunity to raise constitutional challenges." *Zahl v. Harper*, 282 F.3d 204, 209 (3d Cir. 2002).

*Younger* abstention applies both to injunctive and damage suits. *See Gwynedd Properties v. Lower Gwynedd Township*, 970 F.2d 1195 (3d Cir. 1992); *Williams v. Hepting*, 844 F.2d 138 (3d Cir. 1988). It also applies whether the ongoing state proceedings are civil or administrative. *See Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.*, 477 U.S. 619, 629 (1986); *Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 75 (2d Cir. 2003), *cert. denied*, 541 U.S. 1085 (2004); *Christ the King Regional High School v. Culvert*, 815 F.2d 219, 223-24 (2d Cir.), *cert. denied*, 484 U.S. 830 (1987).

Here, abstention as to the discrimination issues is merited. ALJ Tiscornia found that the Plaintiffs' LAD and ADA claims "do not arise under the New Jersey School Laws and are therefore outside the Commissioner's jurisdiction pursuant to N.J.S.A. 18A:6-9." D.E. 30-3 at 2. But the ALJ did exercise jurisdiction over Plaintiffs' claims under the New Jersey Equality and Equity in Education Law, N.J.S.A. 18A:36-20, which "prohibits discrimination in admission to, or in obtaining any advantages, privileges or courses of study of the school by reason of race, color, creed, sex or national origin." *Id.* The ALJ found that the Child's "disability is not the proximate cause of why she is not being picked up in front of her house." *Id.* Rather, the "hazardous road . . . prevents the shorter bus from stopping in front of the home[.]" *Id.* at 2-3.

On appeal, the Commissioner ordered transportation between the Home and Sage for the 2023-24 school year utilizing any kind of vehicle—including a large school bus—necessary to accomplish the transportation. *Id.* at 5. Based on that finding, the Commissioner declined to address the jurisdiction arguments. *Id.*

But there is no indication that the discrimination issue, or more precisely the issue of whether the Commissioner (or the ALJ before that) had the jurisdiction to consider the discrimination issue, is *not* before the Appellate Division.  Indeed, Plaintiffs recognize that the Board identified as an issue before the Appellate Division "whether the Commissioner has jurisdiction over . . . [the] discrimination claims."  *Id.* at 12 n.1.  Importantly, "[a]ny uncertainties as to the scope of state proceedings or availability of state remedies are generally resolved in favor of abstention."  *Spargo*, 351 F.3d at 78 (citation omitted).

Finally, there is likewise no indication that Plaintiff's discrimination claims and arguments cannot adequately be addressed by the Appellate Division.  Accordingly, the Court declines to address the discrimination claims here, and will **DISMISS** them ***without prejudice***.[12]

### C.    Remedy

The Parents seek both injunctive and monetary relief, arguing that the Board may seek to reinstate the objectionable transportation arrangement between the Municipal Building and the Child's school, and that the $513.84 awarded by ALJ Tiscornia is insufficient.

As to injunctive relief, the Court notes, at the outset, that the Commissioner's Final Discrimination Decision required the Board "to provide [the Child] with curb-to-curb

---

[12] Plaintiffs seek precisely the same relief under the discrimination counts as under the IDEA counts: reimbursement, injunctive relief for future transportation to and from the Home, and fees. However, as the Third Circuit recently clarified in a pair of special education-related cases, IDEA and discrimination claims have distinct standards and procedure.  *See Le Pape v. Lower Merion Sch. Dist.*, No. 22-2931, 2024 U.S. App. LEXIS 13400, at *38 (3d Cir. June 4, 2024) ("A denial-of-FAPE claim under the IDEA can be resolved through an administrative appeal, but ADA and Section 504 discrimination claims seeking compensatory damages, even if on the same facts, should be resolved through summary judgment and, possibly, trial."); B.S.M. v. Upper Darby Sch. Dist., No. 23-1595, 2024 U.S. App. LEXIS 13399, at *17 (3d Cir. June 4, 2024) (noting that while the same conduct can serve as the basis for IDEA and Rehabilitation Act claims, separate analysis is required because the latter "covers more students than does the IDEA, including students who are merely perceived as disabled.").

transportation to and from Sage beginning in the 2023-24 school year." Discrim. Final Dec. at 6. Thus, Plaintiffs have already received the ultimate relief that they seek. Nevertheless, based on the discussion above, the Court finds that injunctive relief is also appropriate. The road outside the Home will not get any less treacherous, and the Child's transportation needs will therefore continue. Accordingly, the injunction will require curb-to-curb transportation between the Home and the Child's school for as long as the Child's education falls within the Board's purview, and will require amendment of the IEP to reflect that requirement.

As to the question of any financial remedy, the Parents seek "reasonable" compensation for transporting the Child between the Home and Sage between September 10 and October 7, 2021, and between the Home and the Municipal Building between October 8, 2021 and June 3, 2022, a total of 139 days. Mot. at 36-38. The Parents' definition of reasonable is the value of a local taxi trip between the Home and Municipal Building ($8 + $2 tip each way, or $40/day). The Parents provide no support for this definition of reasonable. Conversely, however, numerous courts have upheld similar remedy calculations relying upon the Internal Revenue Service's standard mileage rate—in 2021, $0.56 per mile. *See* IRS standard mileage rates, https://perma.cc/Q6HF-7ZLC (accessed May 22, 2024); *R.S. v. Morgan Cnty. Bd. of Educ.*, No. 3:18-CV-80, 2019 WL 2518136, at *8 (N.D.W. Va. June 18, 2019) (collecting cases).

Accordingly, the Court calculates the damages as follows. Between September 10, 2021, and October 7, 2021, when S.S. drove the Child to and from Sage twice daily, they drove 27.5 miles each way, twice daily, or 110 miles per day for 20 days. *See* Pls. Facts ¶¶ 67-68. Multiplied by the $0.56 IRS standard rate, the Parents are entitled to $2,200. Subtracting the $513.24 they received, they are entitled to $1,686.76 for that period.

As for the remaining 139 school days requiring transportation between the Home and Municipal Building, that distance is .3 miles. *Id.* ¶ 82. Assuming 1.2 miles (.3 miles x 4 daily trips), that amounts to an additional $93.49 (1.2 miles x 139 x .56). Added to the $1,686.76 already awarded, that totals $1,780.17.

## IV.    CONCLUSION

For the reasons above, the Parents' summary judgment (D.E. 29) is **GRANTED *in part*** to the extent that the Court will award injunctive and monetary relief as discussed above, and the Board's cross-motion for summary judgment (D.E. 35) is **GRANTED *in part*** to the extent of dismissing all discrimination claims (Counts IV-VI). An appropriate order follows.[13]


Dated: June 12, 2024

Evelyn Padin, U.S.D.J.

---

[13] To the extent that the Parents may seek counsel fees, the Court advises the parties to meet and confer regarding a reasonable compromise.